[Civ. No. 30391. Second Dist., Div. Three. Mar. 18, 1968.]

EMMETT T. STEELE, Plaintiff and Respondent, v. LITTON INDUSTRIES, INC. et al., Defendants and Appellants.

O'Melveny & Myers, Philip F. Westbrook, Jr., William A. Masterson, Trippet, Yoakum & Ballantyne and Frank B. Yoakum, Jr., Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin for Defendants and Appellants.

Harold Rhoden for Plaintiff and Respondent.

FRAMPTON, J. pro tem.*—The defendants Litton Industries, Inc., Charles B. Thornton, Roy L. Ash, Hugh W. Jamieson and Electro Dynamics Stock Trust Fund, a partnership, have appealed from the judgment and, by means of a second notice of appeal, from the order denying their respective motions for judgment notwithstanding the verdict.

It was alleged in each of the first six counts of the complaint of the plaintiff Steele that the defendants Thornton, Ash and Jamieson were copartners, doing business under the name of Electro Dynamics Stock Trust Fund and that Thornton was the agent of each of the other defendants. Those counts related to an agreement that was alleged to have been made by Thornton and the plaintiff Steele in 1958 pursuant to which Steele was to be permitted to purchase shares of Litton Industries stock equal in amount to the shares received by the defendants Ash and Jamieson. The first three counts were directed against all of the defendants and the fourth, fifth and sixth counts against all of the defendants except Litton Industries, Inc. The first count was for damages for fraud arising from the making of a promise to the plaintiff without intent to perform it; the second count was for damages for breach of contract; the third count was for specific performance; the fourth and fifth counts were for relief by means of

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

the imposition of a constructive trust, and the sixth count was for the enforcement of an express trust.

The seventh, eighth and ninth counts related to a promise alleged to have been made in 1953 by Thornton to the plaintiff Steele that he would be permitted to purchase shares of Litton Industries stock in an amount equal to the number of shares transferred to Ash and Jamieson or either of them. In the seventh count, directed against the defendants Thornton, Ash and Jamieson, a conspiracy to defraud Steele was alleged and damages for fraud were sought. The eighth and ninth counts were directed against all of the defendants other than Litton Industries, Inc., and the relief sought was the imposition of a constructive trust.

The tenth count was for declaratory relief.

At the trial the counts for fraud (count seven, relating to the alleged 1953 promise, and count one, relating to the alleged 1958 agreement) and the count for damages for breach of the alleged 1958 agreement (count two) were submitted to the jury. The other counts, being equitable in nature, were submitted to the trial judge. On April 19, 1965, the jury returned a verdict in favor of the plaintiff as against all of the defendants in the sum of $5,182,885,[1] together with interest thereon. In response to special interrogatories the jury stated that its verdict was based upon the first and second counts which related to the alleged 1958 agreement and not upon the seventh count which related to the alleged 1953 promise. On the day of the verdict the trial judge filed his "Decision" in which he stated his opinion that the plaintiff was not entitled to the equitable relief sought under the remaining counts, other than that relating to declaratory relief, and that it was not necessary to specifically grant declaratory relief inasmuch as the determination of the other causes of action would "completely adjudicate the rights, duties and obligations of the parties hereto." As will be explained, the trial judge did not thereafter sign and file findings of fact and conclusions of law and render judgment with respect to the equitable counts.

On April 30, 1965, the plaintiff Steele filed a document, the body of which was as follows: "Plaintiff hereby elects of alternative remedies sought by his Complaint his claim for

---

[1] In the appellants' opening brief it is stated (p. 41): "It is apparent that it reached this figure by subtracting from $5,208,000 (market value of 62,000 shares of Litton stock on December 8, 1958) the $25,115 which respondent said he had to pay."

damages at law as set forth in the First and Second Causes of action, and plaintiff hereby elects to waive his claim for equitable relief as set forth in the Third, Fourth, Fifth, Sixth, Eighth and Ninth Causes of Action, and his claim for declaratory relief as set forth in his Tenth Cause of Action.''[2] On May 3, 1965, the plaintiff filed another document in which he reiterated the ''election'' so expressed and stated that he dismissed ''with prejudice his alternative claim for equitable relief as stated in the Third, Fourth, Fifth, Sixth, Eighth and Ninth counts and his request for declaratory relief as set forth in his Tenth count of his Complaint.'' The plaintiff Steele further stated therein that the ''Election, Waiver, and Dismissal is not intended to, and does not dismiss plaintiff's claim for damages at law as set forth in the First and Second counts of his Complaint.'' On the same date the plaintiff filed a written request, addressed to the clerk, to enter his ''election of remedies by dismissal with prejudice of alternative claim for equitable relief.'' On May 4, 1965, the plaintiff filed a further request, addressed to the clerk, to enter a dismissal with prejudice of third, fourth, fifth, sixth, eight, ninth and tenth counts of the complaint, stating that said request did not affect the first and second counts. On the same date the clerk signed a statement attached to the request which was as follows : ''Dismissal entered this 4 day of May, 1965.''

On May 7, 1965, the defendants filed a notice of motion for an order vacating and setting aside the plaintiff's request to the clerk, filed on May 4, 1965, for entry of a dismissal of the alternative counts for equitable relief, separate ground for such motion being stated as follows : ''1. That the purported dismissal entered was not a dismissal with prejudice of any cause or causes of action; 2. That the purported dismissal entered was not timely under C.C.P. § 581.5; 3. That the purported dismissal entered was and is ineffective under Code Civ. Proc., § 581.5 since it does not dismiss any cause of action but only alternative counts or claims for relief.'' It was further stated that in the event that it should be determined that the purported dismissal which had been entered was timely and proper, the defendants would move in the alternative for an order adjudging that such dismissal constituted a dismissal with prejudice of the plaintiff's entire action ''and

[2]Proposed findings of fact and conclusions of law with respect to the equitable causes of action, prepared by counsel for the defendants, had been lodged with the court on April 22, 1965, but the trial judge had not acted thereon.

each of the two causes of action and all counts thereof set forth in his complaint . . . on the ground that the legal effect of such purported dismissal is a dismissal with prejudice of plaintiff's entire action.'' The motion to vacate the dismissal and the alternative motion for an adjudication that there had been a plenary dismissal with prejudice of the plaintiff's action were denied on May 14, 1965.

The judgment based on the verdict of the jury was entered on July 9, 1965. The defendants' motion for a new trial was directed to the issues raised by the first and second counts. That motion was granted on August 25, 1965.

■ The plaintiff did not appeal from the order granting a new trial and that order became final. The defendants state in their opening brief that they appealed from the judgment ''to be certain to preserve for review the question as to the effect of the dismissal of the equity counts with prejudice.'' One effect of an order granting a new trial, however, is to vacate the judgment.[3] (*Spencer* v. *Nelson*, 30 Cal.2d 162, 164 [180 P.2d 886].) Consequently, the defendants' purported appeal from the judgment must be dismissed. (*Neff* v. *Ernst*, 48 Cal.2d 628, 634 [311 P.2d 849].)

The subject of the second appeal is the order denying the defendants' motion for judgment notwithstanding the verdict. That order was made on August 25, 1965, concurrently with the order granting the defendants' motion for a new trial.

■ One of the defendants' contentions with respect to the second appeal is expressed as follows (references to the record being omitted herein): ''In the alternative second count, respondent claimed that the April 8, 1958 promise was made without the intent to perform. The jury verdict was based on that count as well as the contract count. However, there was no evidence of any legally recoverable fraud damages to support this determination.'' It is to be noted that in their opening brief the defendants state that on this appeal they do not seek review of the sufficiency of the evidence as to the making of a promise by Thornton. Moreover, as has been noted (fn. 1, *supra*), in the same brief the defendants explain the basis of the amount of the verdict for breach of contract.

---

[3]The plaintiff asserts in his brief that because of the defendants' appeal from the judgment they are estopped from contending that the judgment was vacated by the order granting a new trial. That position is untenable. (See *Telefilm, Inc.* v. *Superior Court*, 33 Cal.2d 289, 295-96 [201 P.2d 811].)

Consequently, since the case as here presented is one wherein there was sufficient substantial evidence to support the verdict on the tenable theory of breach of contract, the order cannot be successfully challenged on the ground asserted. (See *Reynolds* v. *Willson*, 51 Cal.2d 94, 99 [331 P.2d 48].)

 It is contended that the motion for judgment notwithstanding the verdict should have been granted because there was no evidence of Thornton's authority to bind the defendants Ash, Jamieson and Litton Industries, Inc. As to Thornton's authority to speak and act on behalf of Ash and Jamieson the record discloses the following: The defendant Electro Dynamics Stock Trust Fund, hereinafter referred to as EDSTF, was a copartnership composed of the defendants Thornton, Jamieson and Ash. One of the objects for which the partnership was formed, as set forth in subdivision (a) of paragraph 1 of the partnership agreement, was "To purchase and hold shares of stock and securities of various corporations, including, specifically, shares of stock of Electro Dynamics Corporation and options to purchase shares of stock of that company." Paragraph 7 of the partnership agreement provided in part as follows: "*Management*. In all matters relating to policy and management of the partnership business, other than voting shares of stock owned by the partnership, the voice of the respective partners in said decision shall be as follows:

| | |
|---|---|
| Charles B. Thornton | 50% |
| Hugh W. Jamieson | 25% |
| Roy L. Ash | 25% |

A majority (i.e., more than 50% of the voting power) shall prevail on all matters." Thornton testified that the business activity of EDSTF was to own stock in Litton Industries (formerly Electro Dynamics Corporation) and options to purchase stock in Litton Industries, and to sell or dispose of that stock in accordance with the decisions of the partners and the partnership agreement; in the purchase of the original shares of Electro Dynamics Corporation he acted for himself and as the agent of Ash and Jamieson and he acted for himself and as the agent for Ash and Jamieson in entering into contracts on behalf of EDSTF with employees of Litton Industries for stock and stock options; as a partner of the fund (EDSTF), he acted on behalf of the fund with various employees of Litton Industries for the transfer of stock or stock options; from the time of the inception of the fund until 1958 or 1959, as a partner in the fund, he entered into con-

tracts on behalf of the fund with key employees of Litton Industries; the contracts dealt with stock and stock options.

The defendant Jamieson testified in portions of his deposition, which were received in evidence, that the fund (EDSTF) operated to hold and distribute to the partners and to others, at the discretion of the partners, the shares of the Electro Dynamics Corporation stock or Litton Industries stock. In Jamieson's deposition in an action he had filed against Thornton and Ash he admitted that Thornton had instructed him ''to avoid specifically, insofar as I could, any detailed discussion with anybody else besides him [Thornton] and Roy [Ash] as to the sharing of the stock ownership, and to let him [Thornton] be the point of contact with outside people and anybody except the three of us [Thornton, Ash and Jamieson]. And I did my best for the four years plus that I was there to see that that happened.'' With respect to Thornton's views on the subject of disclosure or nondisclosure of stock ownership, Jamieson testified that he went along with Thornton in doing it his way. By deposition, Jamieson testified that sometime in 1953, conversations were had between himself, Thornton and Ash whereby it was understood that they would be joint venturers in any organization or corporation formed by them, and would share equally therein.

The defendant Ash testified that EDSTF engaged in the business of owning, buying and selling stock; this activity was confined to Litton Industries stock and the selling was ''selling in a particular way as is defined, I think, in the— and under the particular conditions that are defined within the understanding of the participants—of the partners''; that he was a copartner in EDSTF with Thornton and Jamieson; that sometime in 1954 or 1955, in a conversation between Thornton, Ash and Jamieson, either he or Jamieson made the statement, in substance, that there will be a lot of unhappy people when the truth comes out about the number of shares owned by him, Thornton and Jamieson.

Plaintiff Steele testified that in September 1953 there were discussions between Thornton, Ash, Jamieson and Steele about forming a new corporation to acquire the business of Charles Vincent Litton; the responsibilities of each in the new organization were discussed and Thornton was to be the executive officer, Jamieson would handle engineering, Ash would handle finances and act as controller and Steele would handle sales; there would be founders stock available to them; it was Thornton's plan, approved by Steele, Ash and Jamie-

son to get 51 percent control of the stock issued in the new venture for the four of them and for key employees; Steele would not have entered the venture on the basis of salary alone without the promise of the opportunity to acquire a share of the founders stock in the new venture; Thornton promised that the founders stock would be split on the basis of two shares for Thornton and one share each for Steele, Ash and Jamieson; Thornton was to raise the money to buy the stock and Steele, Ash and Jamieson would reimburse him when the stock would be issued to them; Thornton wanted the numbers of the shares when he got them to be kept strictly confidential. In 1954, Thornton told Steele that he had acquired the founders stock, that it would be put into a fund and "that it would be allocated to us at an appropriate time." Steele testified further that about February or March 1954, Thornton told Steele that Thornton, Ash and Jamieson would constitute a committee to take care of the stock in the fund; that as key employees were hired it would be necessary to sign papers and do other things with which Steele would not be familiar, and inasmuch as Steel's duties would occupy him away from the home office a majority of the time, it would not be necessary for Steele to be a member of such committee.

Steele testified further that in April 1958, he told Thornton that "I wanted the rest of my founders' stock, the same that Roy [Ash] and Bill [Jamieson] got." Thornton replied to this demand, stating, "Well, you have got more key employee stock than anybody, other than the four of us." Steele told Thornton that it was not the key employees stock that he was interested in but it was his founder's stock that he wanted, "the same that Roy and Bill got." Thornton then told Steele, "You'll get it." Steele testified that Thornton promised delivery of the founders stock around December 8, 1958, when restrictions were to be lifted on key stocks to key employees; that there was to be a reorganization in the corporation, and in the division, and that there would be a redistribution of stock at that time. Steele told Thornton at this time that he was prepared to pay him the same amount of money for the founders stock that "Roy and Bill had paid for theirs." Thornton assured Steele that the stock was being held for him; he also told Steele that he expected him to stay on, not to cause any dissension or friction in the equipment division and to use his best efforts and all of his ability in his field to keep the contracts that were in danger, in the house.

About January 1959 Steele discovered that in 1953 one hundred thousand shares of founders stock had been issued and that Thornton had given Ash and Jamieson each twenty thousand shares of this stock and had taken the remaining sixty thousand shares for himself. Upon learning of this he immediately went to Thornton's office. Steele told Thornton of what he had learned and told him that this was not in accordance with the promise that had been made by Thornton in 1953, nor was it in accordance with other promises and representations that Thornton had made subsequent thereto. At this time Thornton denied that a promise had ever been made to Steele respecting Steele's rights to share in the founders stock, and stated further that if Steele ever had a claim it was too late to assert it now. Steele threatened suit against Thornton and on the day after this threat was made Steele was locked out of his office at Litton Industries.

The witness Noah Dietrich testified that in September 1953, he participated in a conversation between Steele and Jamieson on the subject of organizing a group to acquire the Litton company; Jamieson stated that the idea of becoming a proprietor along with associates appealed to him and that he was giving it serious consideration; Jamieson had discussed the matter with Thornton who was enthusiastic about it and who had suggested that Mr. Ash come into the group making it a group of four; Jamieson stated that the group, referred to as founders, would participate in a pool of founders stock and that he, Steele and Ash would share equally in the pool, and that Thornton, as the leader of the group, would have a larger interest in the pool. Later, in December 1953, at a meeting between Dietrich, Steele and Jamieson, when Dietrich reiterated an offer to Jamieson and Steele to return to work for Hughes Aircraft Company, Jamieson stated that he, Mr. Steele, Mr. Ash and Mr. Thornton had decided to proceed with the acquisition of Litton Industries, and he would therefore have to reject the offer; that Steele also rejected the offer at this meeting. Dietrich testified further that in early 1954, he had talked to Thornton on a matter relating to Steele's financial responsibility to purchase a parcel of residential property owned by Dietrich. At this time Thornton assured Dietrich of Steele's financial responsibility, stating, "that as a founder of Litton Industries, he [Steele] was certain to become very wealthy and he anticipated no problem on my part in collecting the money from Mr. Steele" and that "Ash, Steele and Jamieson are all on an equal basis in this founders' pool of stock."

The proceedings at the trial are contained in 65 volumes of the reporter's transcript consisting of 17,007 pages. The foregoing résumé is sufficient, we believe, to show that the trial judge, in passing upon the motions for entry of judgment notwithstanding the verdict, had substantial evidence before him to support the conclusion that Steele had been promised a share in the founders stock, equal to that of Ash and Jamieson, to be acquired by a joint venture to be formed for such purpose, including Steele as a joint venturer; that the joint venture was formed by Thornton, Ash and Jamieson under the name of the defendant Electro Dynamics Stock Trust Fund; that the joint venture acquired, controlled and disposed of the founders stock in accordance with the decisions of the joint venturers; that with the knowledge and consent of Ash and Jamieson, Thornton spoke and acted on behalf of the joint venture with respect to the acquisition and disposition of the founders stock in Litton Industries held by the joint venture; that Thornton in his dealings with Steele with respect to the founders stock was acting within the scope of the joint venture and in furtherance of its agreed purposes and that the joint venturers retained benefits by Thornton's conduct. In these circumstances the acts of Thornton were binding upon the joint venture and its individual members. (3 Witkin, Summary of Cal. Law (1960) Partnership, § 12, p. 2275; *Grant* v. *Weatherholt,* 123 Cal.App.2d 34, 45 [266 P.2d 185]; *Deicher* v. *Corkery,* 205 Cal.App.2d 654, 662 [23 Cal. Rptr. 270]; *Pearson* v. *Norton,* 230 Cal.App.2d 1, 15 [40 Cal. Rptr. 634]; *Orlopp* v. *Willardson Co.,* 232 Cal.App.2d 750, 754 [43 Cal.Rptr. 125].)

▇ Plaintiff, who has represented in his brief that he has made an exhaustive analysis of the evidence relating to the points raised on appeal, claims that the facts are sufficient to sustain the court's order denying the motion for judgment notwithstanding the verdict as to the defendant Litton Industries, Inc. The evidence brought to our attention by the plaintiff in this connection shows that Thornton was the president and chairman of the board of directors of the defendant corporation. The record shows that Thornton's response to an interrogatory was received in evidence as against Thornton and Litton Industries, Inc. The questions asked and the answers thereto are as follows: ''Q. At any time between October, 1953, and January, 1959, did you discuss with Steele his salary at Litton Industries? If your answer is in the affirmative, did you, in such conversations, act as agent for

Litton Industries and/or Electro Dynamics Stock Trust Fund, and/or Messrs. Ash and Jamieson? A. My recollection is that at various times during the period to which you refer in your question, Mr. Steele came to me and complained that the salary which he was receiving was not high enough. In any such discussions, Mr. Steele could have been talking to me only in my capacity as President of Litton Industries, Inc., formerly known as Electro Dynamics Corporation, and in his capacity as an employee of a division of such corporation. Accordingly, I suppose that I was acting as the agent for Litton Industries, Inc., formerly known as Electro Dynamics Corporation.'' Plaintiff urges that Thornton, as the president of Litton Industries, Inc., had the authority to, and did hire and fire employees of the corporation, and had the authority to fix their compensation; that Thornton promised Steele, as part of his compensation as an employee of the corporation, that Steele would receive a percentage of the founders stock; that this promise on the part of Thornton, acting as the agent of the corporation, was binding upon it, and that for the breach of such promise the corporation is liable in damages to plaintiff. He urges further that Litton Industries, Inc., as an employer of Thornton, was directly liable to plaintiff because upon learning of Thornton's fraud it affirmed it and made it its own by its failure to discharge Thornton, thereby ratifying his tortious act.

Plaintiff does not point out any evidence in the record to show that in September 1953, when he claims that there was an oral agreement whereby he was to share in the founders stock of the new corporation to be formed for the purpose of acquiring the business of Charles Vincent Litton, that Thornton at that time was the president of Litton Industries, Inc., or its predecessor. If Thornton, at the time of such claimed oral agreement was not the president of Litton Industries, Inc., and Steele was aware of this, as the evidence discloses, Steele could not rely upon Thornton's promise of a share in founders stock as being binding upon a corporation which he knew that Thornton did not represent. No evidence has been pointed out in the record that Litton Industries, Inc. was ever aware of such a promise on the part of Thornton. The joint venture between Thornton, Ash and Jamieson was an entity separate and apart from Litton Industries, Inc. It is not shown that the corporation had the right to control the acts and conduct of the joint venture with respect to the acquisition or disposition of any stock held by it. The stock held by

the joint venture in which Steele claimed an interest was founders stock in Litton Industries, Inc., as distinguished from treasury stock and the disposition of such stock by the joint venture required no act on the part of, or consent thereto by the corporation. The principal object of the joint venture appears to be to obtain for the joint venturers a capital gain on the founders stock held by it resulting from the combined efforts of the joint venturers rather than a plan to issue such stock as part salary to such members in connection with their employment with defendant corporation. It is not shown that the board of directors of the defendant corporation ever adopted or sanctioned the plan of the joint venture with respect to the acquisition and disposition of the founders stock as a means of increasing the compensation of its officers and employees.

Plaintiff, in his brief, states that the 1953 promise was made to him by Thornton because, as he claims, he was one of the original four founders of the company, and that the promise made in 1958 by Thornton was, in effect, a promise to keep a prior promise. This points up the fact that plaintiff knew at all times that the promise made by Thornton to him to give him a share of the founders stock, acquired and held by the joint venture, was not one made by Thornton as an officer and agent of the defendant Litton Industries, Inc., but was made by Thornton as a member of the joint venture. It is the general rule that knowledge of an officer of a corporation within the scope of his duties is imputable to the corporation. (*Sanders* v. *Magill,* 9 Cal.2d 145, 153 [70 P.2d 159].) The business of the joint venture with respect to the founders stock acquired and held by it, according to the record, was conducted secretly. It was conducted independently of the business of the defendant Litton Industries, Inc. No evidence has been pointed out in the voluminous record to show that it was part of Thornton's duty as an officer of the defendant corporation to manage, or participate in the management of the joint venture for the benefit of the corporation. Furthermore, the agreement of the joint venture to give Steele a share in the founders stock of the corporation to be formed was in the nature of an agreement between promoters of the new enterprise whereby each would profit from his efforts in making the new enterprise a success. The promise was not that of the corporation which was not in existence at the time such promise was made. ▮ The fact that some of the promoters subsequently became officers and employees of the new corpo-

ration does not make the corporation liable upon the promoters' contract unless it adopted it after its incorporation. Receipt of benefits from the performance of the contract without actual knowledge of its terms is insufficient. Knowledge of a director directly interested in the contract is insufficient to charge the corporation. Knowledge of a promoter, who subsequently becomes a director, cannot be imputed to the corporation. (*Abbott* v. *Limited Mut. Comp. Ins. Co.*, 30 Cal.App.2d 157, 162-163 [85 P.2d 961] ; see also, *Commercial Lbr. Co.* v. *Ukiah Lbr. Mills*, 94 Cal.App.2d 215 [210 P.2d 276].)

We have assumed that plaintiff has pointed out all of the evidence contained in the record favorable to his contention that the defendant Litton Industries, Inc. should be held responsible for the promises of Thornton, and under rule 15(a), California Rules of Court, we have not undertaken an independent examination of the record. (See *Du Zeff's Hollywood, Inc.* v. *Wald*, 235 Cal.App.2d 678, 682-683 [45 Cal.Rptr. 584].) From the evidence to which our attention has been directed, we are of the opinion that it is insufficient to sustain a judgment in favor of plaintiff and against the defendant Litton Industries, Inc.

The defendants on this appeal do not press their contention as to the application of the statute of frauds and the parol evidence rule.

With respect to the question of the propriety and effect of the plaintiff's dismissal of the equitable counts it has been noted that the trial judge never signed and filed findings of fact and conclusions of law. In the absence thereof there was no decision with respect to those counts. (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court*, 208 Cal.App.2d 803, 825 [25 Cal.Rptr. 798] ; see 3 Witkin, Cal. Procedure (1954) Appeal, § 77, p. 2236.) Moreover, the situation arising from the steps taken by the plaintiff to remove the equitable counts from the case was not one which was in existence prior to the submission of the case to the jury and hence was not a ground which would have required the granting of a motion for a directed verdict had such a motion been made. (See Code Civ. Proc., § 629.)[4] Furthermore, if plaintiff's dismissal of the

---

[4]The first paragraph of section 629 of the Code of Civil Procedure is as follows: ''The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made.''

equity counts had occurred prior to the time when the case was submitted to the jury and if we assume *arguendo* that such dismissal constituted a dismissal with prejudice of the entire primary right upon which the suit was based, the granting of a directed verdict would still have been improper for the court would no longer have had jurisdiction to proceed in the matter. (*Long* v. *Superior Court,* 14 Cal.App.2d 753, 755 [58 P.2d 952]; *Cubalevic* v. *Superior Court,* 240 Cal.App. 2d 557, 562 [49 Cal.Rptr. 698]; *Eddings* v. *White,* 229 Cal. App.2d 579, 583-585 [40 Cal.Rptr. 453]; *Nickola* v. *Superior Court,* 111 Cal.App.2d 620, 622 [245 P.2d 20]; *Provencher* v. *City of Los Angeles,* 10 Cal.App.2d 730, 733 [52 P.2d 983].)

 The defendants urge that the dismissal with prejudice of the equity counts under the provisions of subdivision 5 of section 581 of the Code of Civil Procedure[5] constitutes a dismissal of his entire cause of action.

Upon the technical aspects of the record we could decline to pass upon the effect of the dismissal by plaintiff of the equity counts because, as heretofore pointed out, the question is raised on appeal from a non-existent judgment. Such question, however, was presented to the trial court and it has been raised and extensively argued in the briefs. Furthermore, the question will undoubtedly again be raised on a retrial of the case. It could be raised by a writ proceeding prior to trial, or could be raised on appeal after another lengthy and costly trial. We believe the point is raised here in such manner and under such circumstances as to warrant our decision on it for the benefit of the trial court on the retrial of the case. (See *Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634, 643 [160 P.2d 804]; *Westerfeld* v. *New York Life Ins. Co.,* 157 Cal. 339, 345 [107 P. 699]; *Porter* v. *Muller,* 112 Cal. 355, 366 [44 P. 729]; *Gwinn* v. *Hamilton,* 75 Cal. 265, 266 [17 P. 212]; *People's Lumber Co.* v. *Gillard,* 5 Cal.App. 435, 438 [90 P.

---

[5]Subdivision 5 of section 581 of the Code of Civil Procedure is as follows: ''The provisions of subdivision 1, of this section, shall not prohibit a party from dismissing with prejudice, either by written request to the clerk or oral or written request to the judge, as the case may be, any cause of action at any time before decision rendered by the court. Provided, however, that no such dismissal with prejudice shall have the effect of dismissing a counterclaim or cross-complaint filed in said action or of depriving the defendant of affirmative relief sought by his answer therein. Dismissals without prejudice may be had in either of the manners provided for in subdivision 1 of this section, after actual commencement of the trial, either by consent of all of the parties to the trial or by order of court on showing of just cause therefor.''

556]; *Chamberlain Co.* v. *Allis-Chalmers Mfg. Co.,* 74 Cal. App.2d 941, 942-943 [170 P.2d 85].)

The cause of action is the obligation sought to be enforced. The same cause of action may be stated variously in separate counts. In California the phrase "cause of action" is often used indiscriminately to mean what it says and to mean counts which state differently the same cause of action. (*Eichler Homes of San Mateo, Inc.* v. *Superior Court,* 55 Cal.2d 845 [13 Cal.Rptr. 194, 361 P.2d 914].) It is proper practice for a plaintiff to ask for inconsistent remedies in a single complaint. (*Tanforan* v. *Tanforan,* 173 Cal. 270, 273 [159 P. 709]; *Lambert* v. *Southern Counties Gas Co.,* 52 Cal.2d 347, 352 [340 P.2d 608]; *Leoni* v. *Delany,* 83 Cal.App.2d 303, 309 [188 P.2d 765, 189 P.2d 517].) A plaintiff who sets forth alternative remedies in separate counts in his complaint may abandon or dismiss one count without prejudice to his right to proceed on the other. (*Mackenzie* v. *Voelker,* 123 Cal.App.2d 538, 540-541 [266 P.2d 867]; *Stevens* v. *Marco,* 147 Cal.App. 2d 357, 383 [305 P.2d 669].) The plaintiff here dismissed the counts wherein he sought equitable relief. These were alternative remedies. The dismissal of these alternative remedies did not constitute a dismissal of plaintiff's entire cause of action. We believe the intent of the Legislature in amending section 581 of the Code of Civil Procedure in 1947 was to prevent a plaintiff from dismissing as of right without prejudice after actual commencement of the trial. (2 Witkin, Cal. Procedure (1954) Proceedings Without Trial, § 22, p. 1658.) It is our further opinion that the Legislature in using the words "action" and "cause of action" in section 581 of the Code of Civil Procedure intended such words to include a count or counts in a single pleading wherein alternative remedies are sought. Such a construction does not compel a defendant to contest in a trial the same cause of action twice. For if the trial proceeds to judgment on one alternative remedy such judgment would constitute a bar to the trial in a subsequent action on the obligation which plaintiff seeks to enforce, but on a different theory. (1 Cal.Jur.2d, Actions, § 75, p. 699, et seq.)

The appeal from the judgment is dismissed. The order denying the motion for judgment notwithstanding the verdict as to the defendant Litton Industries, Inc. is set aside. The court is directed to enter a judgment notwithstanding the verdict in favor of such defendant and against the plaintiff. The order denying the motion for judgment notwithstanding

the verdict is affirmed as to the defendants Charles B. Thornton, Roy L. Ash, Hugh W. Jamieson and Electro Dynamics Stock Trust Fund, a partnership.

Cobey, Acting P. J., and Moss, J., concurred.

A petition for a rehearing was denied April 5, 1968, and the petitions of the respondent and the appellants except Litton Industries, Inc. for a hearing by the Supreme Court were denied June 5, 1968.