[Civ. No. 33863. Second Dist., Div. Four. Nov. 5, 1970.]

NOAH DIETRICH, Plaintiff and Appellant, v.
LITTON INDUSTRIES, INC., et al., Defendants and Appellants.

## COUNSEL

Harold Rhoden for Plaintiff and Appellant.

Ball, Hunt, Hart & Brown, Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Joseph D. Mullender, Jr., and William A. Masterson for Defendants and Appellants.

## OPINION

**FILES, P. J.**—In this action for libel a jury awarded Noah Dietrich compensatory damages in the amount of $75,000 against Charles B. Thornton, Litton Industries, Inc. and George T. Scharffenberger, and exemplary damages in the amount of $5,000,000 against Thornton, $1,000,000 against Litton, and $50,000 against Scharffenberger. The trial court then granted judgment against Dietrich notwithstanding the verdict, and also, as is permitted by Code of Civil Procedure section 629, ordered a new trial if the judgment should be reversed on appeal.

Dietrich is here appealing from the judgment notwithstanding the verdict and the order granting a new trial. Litton, Thornton and Scharffenberger have brought a precautionary cross-appeal from the judgment on the verdict.

Since this case grows out of other litigation which has been occupying the time of the courts for some years, a statement of the background is required first.

In 1959 Emmett T. Steele brought suit against Litton Industries, Inc. and its chief executive officer, Thornton, to enforce oral promises which he claimed were made to him.[1] On November 29, 1962, in preparation for trial of that case, Steele's attorney took the deposition of Dietrich and elicited testimony on the subject of Thornton's character. Dietrich's testimony in the

---

[1]The appeal following the first trial of that action is reported in *Steele* v. *Litton Industries, Inc.* (1968) 260 Cal.App.2d 157 [68 Cal.Rptr. 680].

deposition was defamatory of Thornton in several respects.[2] When the transcript of the deposition testimony was filed with the clerk of the court on December 19, 1962, Dietrich's statements were reported by the news media. The following day Thornton issued a press release commenting upon Dietrich's testimony, and a day later Scharffenberger, who was then a vice president of Litton, issued a circular to the employees of Litton. Those are the publications for which Dietrich is seeking damages in the case here on appeal.

Thornton's press release of December 20, 1962, stated:

"The following statement was made today by Charles B. Thornton, chairman of the board of Litton Industries:

'The statements reported to me as having been made by Noah Dietrich are completely false and maliciously defamatory.

'Dietrich's prior activities over years should be reviewed to properly evaluate his possible motives in making the statements.

'This matter has been given to my attorneys to take appropriate action.

'The false statements made by Dietrich appear to be of the same character as the unfounded claims made in Steele's old lawsuit.' "

Scharffenberger's circular of December 21, 1962, stated:

"The press and television have lately repeated some irresponsible and totally false charges made by one Noah Dietrich against Mr. Thornton, Chairman of the Board of Litton Industries. Under the circumstances we want our employees to be fully informed so that they can correctly interpret the stories and explain the situation to those who may inquire.

"The statements were made in connection with an old law suit filed by a disgruntled ex-employee of the sales division of Litton who was discharged

[2]Dietrich's testimony was to the following effect:

that from 1948 to 1953 Thornton had been assistant general manager of Hughes Aircraft Company, a division of Hughes Tool Company, of which Dietrich was executive vice president;

that Thornton's reputation for truth, honesty and integrity was bad;

that Ernest Breech, executive vice president of Ford Motor Company, where Thornton had been employed prior to 1948, had told Dietrich that Thornton was overly ambitious and not trustworthy;

that Thornton had caused inventory records of Hughes Aircraft to be maintained in such a way as to overcharge the government approximately five million dollars on air force contracts;

that after Thornton had become head of Litton Industries, he had offered to pay Dietrich five million dollars if he would induce Howard Hughes to sell the Hughes Tool Company to Litton.

for cause. A deposition was made in this case by Dietrich, former assistant to Mr. Howard Hughes. The charges that he has made and the true facts in each instance are as follows:

1. That Mr. Thornton tried to buy Hughes Aircraft Company in 1956 and made improper approaches to Dietrich for his support. It is true that in 1957 Dietrich inquired of Mr. Thornton as to whether Litton might buy Hughes Aircraft Company, but it is completely untrue that Mr. Thornton made any improper approach to Mr. Dietrich or anyone else.

2. That the Air Force was overcharged several million dollars as a result of improper accounting methods practiced by Hughes Aircraft Company while Mr. Thornton was Assistant General Manager. This charge is completely false. In fact, Mr. Thornton was responsible for introducing proper accounting methods into that company.

"Mr. Thornton resigned from Hughes Aircraft Company as a result of many disagreements with Mr. Dietrich and Mr. Hughes, and later he formed the company that is now Litton Industries. Mr. Thornton is known by business associates and by those in the military who scrutinize every accounting and other detail of our defense business, as a man of the highest integrity. It is most unfortunate that Dietrich apparently resents Litton's and Mr. Thornton's business success and is now trying to hurt one of the most respected men in our nation.

"Mr. Thornton has given the matter of these irresponsible and malicious attacks to competent attorneys to take proper action."

On December 20, 1962, Thornton filed superior court action No. 810297 against Dietrich and others to recover damages for the publication of the defamatory matter in the deposition. Dietrich counterclaimed for damages for the publication of Thornton's press release. Dietrich later filed another action, No. 830462, against Litton Industries, Thornton and Scharffenberger, claiming damages for the press release and the circular.

Thornton's complaint in case 810297 was severed from the counterclaim and dismissed upon the ground that Dietrich's utterances in the deposition were privileged, and that dismissal was affirmed on appeal (*Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]).

Eventually Dietrich's counterclaim in case 810297 and his separate action No. 830462 were consolidated for trial with five other cases involving these parties and others, arising out of the same general background. It was determined that cases 810297 and 830462 would be tried first, with

the other cases to be tried immediately afterwards before the same judge and jury.

At the conclusion of the first phase, the jury returned the verdict described above, awarding Dietrich a total of $6,125,000. The court then discharged the jury, granted a mistrial as to the five uncompleted cases and granted the motions of Litton, Thornton and Scharffenberger for a judgment notwithstanding the verdict and for a new trial if the judgment should be reversed.

### The Judgment Notwithstanding the Verdict

(a) The press release.

On the cause of action based upon the press release, the court granted judgment against Dietrich upon the ground that he had failed to demand a retraction as provided for in Civil Code section 48a.[3]

Subsequent to the trial court's decision the Supreme Court handed down its decision in *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 114 [77 Cal.Rptr. 243, 453 P.2d 747], which held that the protection given by section 48a "does not apply to third parties who are not participants in the publishing or broadcasting enterprise." That proceeding arose out of a libel case in which Patrick, a candidate for public office, had, in the course of his campaign, made a defamatory statement about Field Research Corporation. The Supreme Court recognized that the purpose of the statute was to afford some protection to those who engaged in the immediate dissemination of news, including publishers, broadcasters and their reporters. The reasons for applying section 48a to such persons had no applicability to Patrick.

Litton and Thornton argue that they were, in effect, "participants" in a news dissemination enterprise because, after the Dietrich deposition had been publicized, the press came to Thornton and Litton and asked for a statement. Responding to this request, Thornton arranged for an employee of Litton to prepare and distribute to the media the press release which contains the alleged libel. Litton has conceded that Thornton was acting as its agent in publishing this statement.

---

[3]Civil Code section 48a, subdivision 1: "In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous."

Granting that Thornton and his writer were, in a sense, writing a story for a newspaper, their position is distinguishable from that of the ordinary news gatherer whom the statute protects. The typical newsman frequently has no firsthand knowledge of the subject, and can only report what others have told him. In order not to discourage the rapid dissemination of news, section 48a places a limitation upon the recovery of damages for libel. Thornton issued his press release under quite different conditions. The news media came to him because he had firsthand knowledge of the facts. Had the press asked him to comment upon matters on which he lacked certain knowledge, he could have, with good grace, explained that he did not know. But this inquiry related directly to Thornton's own personal background. He was not in need of the protection given by section 48a. It was not the purpose of section 48a to encourage a person questioned concerning his own conduct to give false information with impunity. Section 48a therefore offers no defense to the parties here.

(b) The circular—Thornton.

On the cause of action based upon the circular, the trial court gave judgment for Thornton upon the ground that there was no evidence that this publication was prepared or ordered by him. This ruling can be sustained only if we can determine that there is in the record no substantial evidence from which the jury reasonably could have inferred that Thornton ordered this circular. (*Hergenrether* v. *East* (1964) 61 Cal.2d 440, 442 [39 Cal.Rptr. 4, 393 P.2d 164].)

The testimony of Thornton and Scharffenberger, who are the only persons having direct knowledge of these facts, is to this effect:

On the morning of December 21, 1962, after the Dietrich deposition had been reported in newspapers and in news broadcasts, Scharffenberger met Thornton in the Litton office and they talked about it. A short time after that Scharffenberger received telephone calls from some division heads asking information about the Dietrich charges. Scharffenberger then decided, entirely on his own responsibility, to issue the circular to employees. He directed a man in the public relations department to draft it and Scharffenberger approved it and caused it to be disseminated among the local employees of the company. The information in the circular was received by Scharffenberger in his brief conversation with Thornton that morning. They did not discuss preparing a circular; Thornton did not instruct Scharffenberger to prepare the circular; and Thornton did not know in advance that it was prepared and disseminated.

In evaluating this direct testimony the jury was entitled to draw some inferences based upon the relationship of the two men to each other and to their common employer. Thornton was chief executive officer of Litton.

Scharffenberger was a vice president, working directly under Thornton's supervision. It is perfectly clear from the record of this trial that Thornton deeply resented Dietrich's attack upon him, and the jury could reasonably have concluded that on the morning of December 21, 1962, Thornton entertained a state of mind towards Dietrich which fits the legal definition of actual malice. It is also a reasonable inference that Scharffenberger knew Thornton well enough to understand this whether Thornton said so specifically or not.

Scharffenberger testified that he regarded Dietrich's attack upon Thornton as a problem affecting Litton's well-being. The pleadings filed on behalf of Scharffenberger, Thornton and Litton all have alleged that the circular was prepared and distributed because it was thought to be in the interest of the company to let the employees know that Dietrich's charges against Thornton's integrity and business ability were false and irresponsible. Thornton testified that when he heard of the circular he approved of it. We do not construe this testimony as a ratification of it as his personal act, but as an acknowledgment that it was an act properly done by Scharffenberger in the course of his duties as a Litton executive.

From this set of circumstances the jury could reasonably infer that Thornton had made known to Scharffenberger his intense feeling and desire to strike back at Dietrich, that Thornton intended and expected Scharffenberger to take some effective action to this end, and that Scharffenberger so understood him. The jury need not have accepted at face value the self-serving testimony of Thornton and Scharffenberger, which played down the conversation between them that morning. In the light of what the evidence shows about the attitudes of the two men, and their relationship, the jury could reasonably infer that whatever was said by Thornton that morning was in effect a request to Scharffenberger to disseminate Thornton's version of the facts to the employees. On that hypothesis the jury could have found that Thornton, too, was responsible for the issuance of the circular. Thus the judgment in favor of Thornton on this count cannot stand.

(c) The circular—Scharffenberger.

 The trial court granted judgment in favor of Scharffenberger notwithstanding the verdict upon the ground that the circular to employees of Litton was a privileged communication under Civil Code section 47, subdivision 3. That section provides: "A privileged publication or broadcast is one made— . . . 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable

ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

The trial court's order cannot be sustained if the record contains any substantial evidence upon which the jury could make a finding that the communication was malicious.

■ The malice referred to in section 47 is what is sometimes called actual malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person. (See *Davis* v. *Hearst* (1911) 160 Cal. 143, 160, 164 [116 P. 530].) The factual issue is whether the publication was so motivated. "Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given." (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 797 [197 P.2d 713].)

■ Scharffenberger's testimony is that he had no knowledge whatever about the things Dietrich said of Thornton except what Thornton had told him, and he believed Thornton, as he had no reason not to. There is no direct evidence to the contrary. Scharffenberger had not been acquainted with Dietrich and he had not been at Hughes Aircraft. Scharffenberger testified he had no ill will towards Dietrich.

Against this testimony the jury was entitled to draw inferences from other circumstances. Thornton had spoken to Scharffenberger about Dietrich that morning, and it is a reasonable inference that Scharffenberger became aware of how keenly Thornton resented the charges against him. The close personal and business relationship between these two men makes it not improbable that Scharffenberger would share some of his chief's feelings on the subject. Scharffenberger testified that he regarded Dietrich's statements as an attack upon Litton Industries and every one of its employees, including himself.

The jury was also entitled to consider the kind of language in the circular as evidence of the motive of the person publishing it. (See *Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d 791, 799.) The circular went beyond a positive denial of the truth of Dietrich's charges and a statement of Thornton's position. It characterized Dietrich's conduct as "irresponsible and malicious," and added the gratuitous comment "that Dietrich apparently resents Litton's and Mr. Thornton's business success." When the circular is read as a whole, against its background, we cannot say that the jury could not reasonably have inferred that Scharffenberger was motivated by a desire to strike a counterblow which would sting Dietrich.

The judgment in favor of Scharffenberger notwithstanding the verdict must therefore be reversed.

### The Order Granting a New Trial

Thornton, Litton and Scharffenberger all moved for a new trial upon several statutory grounds, including insufficiency of the evidence. At the same time that the court granted judgment notwithstanding the verdict, it also granted the motion for a new trial. This ruling was in the form of an order signed by the judge, which included the following language:

"The Court also grants the motion for a new trial on the following grounds: (1) insufficiency of the evidence to justify the verdict, (2) the verdict is against the law, (3) excessive damages, appearing to have been given under the influence of passion or prejudice and (4) irregularity of the proceedings by the plaintiff whereby the defendants were prevented from having a fair trial. In making this order the Court is convinced from the entire record, including reasonable inferences therefrom, that the jury clearly should have reached a different verdict.

"The specification of reasons are as follows:

"1. Insufficiency of the evidence.

"The truth of defendants' statements can only be determined by ascertaining the truth of plaintiff's deposition testimony.

"It was established that Dietrich was vice-president of Hughes Tool Company in charge of finances. Hughes Aircraft Company was a division of Hughes Tool Company. Thornton was employed as assistant manager of Hughes Aircraft Company. Soon after his employment he was notified that all records and accounting procedures throughout Hughes Tool Company had to be uniform. The controller of Hughes Aircraft Company was appointed by Dietrich. Hughes Aircraft Company secured a contract from the Air Force to build a radar fire control system. The contract was for a fixed price but subject to renegotiation so that the profit could not exceed about 11% of costs or 10% of sales. When the contract was awarded, Hughes Aircraft Company had less than 1,000 employees but in three years had expanded to over 10,000. The records and accounting systems could not keep up with the rapid expansion. By October 1951 the inventory and cost records were in such poor condition that Dietrich, at an expense of about $250,000, authorized the employment of Booz-Allen & Hamilton, a management consulting firm, to solve the problem of inventory records and cost accounting. This study took over 14 months.

"A. The deposition testimony of Dietrich is set out in the pretrial order

and will not be repeated here. Contrary to Dietrich's testimony, it was shown that Thornton had nothing to do with the inventory records and that they were not handled under his instructions. The testimony with reference to 'hiding profits in inventory' and 'Thornton confessed' to this is inherently improbable in view of the fact that this was a fixed price contract, and Dietrich, a responsible businessman, had authorized the expenditure of $250,000 to correct the inventory and cost accounting records.

"B. Instead of ordering $5,000,000 returned to the Air Force, Dietrich ordered the reserve that had been set up on the books for renegotiation of the fixed-price contract be reversed, i.e., this amount instead of being held for possible refund to the Air Force went into profits on which Hughes Tool Company paid income taxes.

."C. Dietrich's testimony with reference to the affidavits to secure progress payments from the Government was contrary to the evidence. It was shown that the Air Force auditors were completely informed of the condition of the records and the progress made on the contract and would not and did not authorize any progress payment until they were satisfied the payment was due.

"D. Dietrich's testimony with reference to Breech is contrary to the evidence. Breech did not know Dietrich and he did not talk to Dietrich. Breech did not write the alleged letter and no such letter was ever written, and Breech did not use an A-26 airplane and Ford Motor Company did not own an A-26 plane. These facts were established by Breech, his secretary and the records of the Ford Motor Company.

"E. Dietrich's testimony regarding Mellon Bank is contrary to the evidence. Mellon Bank did not call the 'V' loan—it was paid at maturity. The bank did not make any statements concerning Thornton. Hughes' banking connection with Mellon Bank was terminated long after Thornton left Hughes Aircraft Company. Howard Hughes wanted to borrow an additional $8,000,000 on a personal unsecured note, but Mellon Bank was not interested. Later, Howard Hughes paid off his personal loan and eventually closed his account.

"F. The evidence is also insufficient in the same manner as set out above in the order granting the motion for a judgment notwithstanding the verdict.

"2. The Court is convinced that both the general and punitive damages are in themselves excessive and were given under the influence of passion and prejudice.

"3. The plaintiff's counsel committed many acts of misconduct (including the 30 listed in Mr. Masterson's declaration) that apparently had a

cumulative effect on the jury. Counsel for plaintiff repeatedly asked improper questions after the Court had sustained objections to such questions. The Court improperly denied motions for a mistrial."

■ The form of this order fully complies with the requirements of Code of Civil Procedure section 657 that the order specify the grounds upon which it is granted and the reasons for granting the new trial on each of the grounds stated. (See *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 109-116 [65 Cal.Rptr. 315, 436 P.2d 315].)

■ In passing upon a motion for a new trial made upon the ground of insufficiency of the evidence the trial judge is required to weigh the evidence; and in so doing he may disbelieve witnesses and draw inferences contrary to those supporting the verdict. When the motion is granted upon this ground the appellate court may reverse only when, as a matter of law, there is no substantial evidence to support a contrary judgment. (*Mercer* v. *Perez, supra,* at p. 112.)

■ In the case at bench one of the defenses was that Thornton spoke the truth when he characterized Dietrich's deposition testimony in the *Steele* case as false, malicious and irresponsible. To determine this it was necessary to receive evidence as to whether or not Dietrich's deposition testimony was false. Thornton's own testimony, together with a great deal of additional evidence, would support the finding that the Dietrich deposition testimony was wilfully false. The order granting a new trial states specifically the portions of the evidence on that issue which the trial judge found credible, and the inferences he drew therefrom, to reach his conclusion that the weight of the evidence was contrary to the jury's verdict. Once the trial judge determined that the defense of truth had been established by a preponderance of the evidence, as he weighed it, the order granting a new trial necessarily followed. Since the order is adequately supported upon this ground it is unnecessary to discuss any of the other grounds upon which it was granted.

### The Attempted Disqualification of the Trial Judge

Immediately after the jury had returned its verdict Judge Rhone called counsel to the bench and said: "I am convinced that the preponderance of evidence in this case indicates that there has to be a verdict in favor of the defendants because when you take the evidence and go down, if there is a motion for new trial—if a motion for a new trial were made, I would have to grant it. I wouldn't have any choice in the matter.

"It occurs to me that it is pretty silly to go through another phase of this lawsuit knowing that I am going to have to grant a motion for a new trial if one is made, and I propose at this time to declare a mistrial with refer-

ence to the other counts, the other cases, and to enter this judgment, enter a judgment on this verdict, then wait the outcome of what motions there may be made on this."

After some comments by counsel the court discharged the jury and declared a mistrial in the other consolidated cases.

Thereafter, and prior to the hearing on the motion for a new trial, counsel for Dietrich filed a notice of motion under Code of Civil Procedure section 170 to disqualify Judge Rhone on the ground of bias and prejudice. The motion was based upon the statement made by the judge after the verdict came in, and also upon a detailed specification of rulings and statements made by the court before and during trial which counsel alleged were so unjustified as to constitute bias and prejudice.

Judge Rhone filed a written declaration under penalty of perjury denying that he was biased or prejudiced and denying the assertions of counsel that he had by his demeanor, facial expression or tone of voice indicated partiality.

The issue of the disqualification of Judge Rhone was heard by Judge Levit. After examining the record and hearing the arguments of counsel, Judge Levit found that Judge Rhone was not biased or prejudiced.

It is the contention of Dietrich's counsel that, notwithstanding that finding, this court should determine that Judge Rhone was disqualified, and that he therefore lacked jurisdiction to grant the motion for a new trial. There is precedent for reviewing the decision made in the disqualification hearing on the appeal from the decision made thereafter by the challenged judge. (*Guardianship of Jacobson* (1947) 30 Cal.2d 312, 316-317 [182 P.2d 537]; *Estate of Buchman* (1955) 132 Cal.App.2d 81, 104 [281 P.2d 608, 53 A.L.R.2d 451].) Assuming without deciding that the motion to disqualify was timely and that the ruling is reviewable, we find no reason to overturn it.

■ To the extent that the declaration of Judge Rhone is in conflict with the charges made by Dietrich's counsel, the former must be deemed true because the trier of the facts, Judge Levit, so determined. (*Briggs* v. *Superior Court* (1932) 215 Cal. 336, 342 [10 P.2d 1003].) We may only determine here whether the undisputed facts establish disqualification as a matter of law. Only two points need be mentioned.

■ The fact that Judge Rhone expressed an opinion as to the weight of the evidence, after the verdict came in and before the motion for a new trial had been made and argued, does not establish bias or prejudice. (*McEwen* v. *Occidental Life Ins. Co.* (1916) 172 Cal. 6 [155 P. 86];

*Wampler* v. *Muller* (1953) 121 Cal.App.2d 396 [262 P.2d 853]; see *Keating* v. *Superior Court* (1955) 45 Cal.2d 440, 443-445 [289 P.2d 209].) In this case, unlike some others, there were circumstances making it necessary for the trial judge to state what he had in mind before the motion for a new trial was heard. Feeling as he did about the verdict, and his duty to set it aside on motion, he could not go ahead with the trials of the consolidated cases before this same jury, nor could he, in fairness, conceal his thoughts and keep the jurors impaneled but idle until it was time to rule on the motion for new trial.

The bulk of counsel's other criticism of Judge Rhone is no more than a disagreement with his rulings. ▮ Erroneous rulings against a litigant, even when numerous and continuous, do not establish a charge of bias and prejudice. (*McEwen* v. *Occidental Life Ins. Co.* (1916) 172 Cal. 6, 11 [155 P. 86].) It is therefore unnecessary for us to review the specific charges.

Inasmuch as the trial court has granted a new trial, and we are affirming that order, the appeal of Thornton, Litton and Scharffenberger from the judgment on the verdict is moot.

The judgment notwithstanding the verdict is reversed. The order granting a new trial is affirmed. The appeal from the judgment on the verdict is dismissed as moot. No costs on appeal shall be recovered by any party.

Dunn, J., and Frampton, J.,* concurred.

A petition for a rehearing was denied December 1, 1970, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied January 21, 1971. Wright, C. J., did not participate therein.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.