[S.F. No. 23890. Dec. 7, 1979.]

ANAND P. AGARWAL, Plaintiff and Respondent, v.
LEONARD W. JOHNSON et al., Defendants and Appellants.

COUNSEL

Edwin L. Currey, Jr., Shand S. Stephens, Gilmore F. Diekmann, Jr., and Bronson, Bronson & McKinnon for Defendants and Appellants.

Franklin J. Flocks, John J. Pico and Pico & Parks for Plaintiff and Respondent.

## Opinion

**MOSK, J.**—We granted a hearing in this case for the purpose of considering whether certain jury instructions on respondeat superior and damages for intentional infliction of emotional distress were prejudicially erroneous. After reviewing the record, we conclude that the opinion by Presiding Justice Taylor for the Court of Appeal in all other respects correctly treats and disposes of the issues involved; that the judgment of the trial court should be affirmed; and that with certain changes, the opinion of the Court of Appeal is adopted as the opinion of this court. The opinion, with appropriate deletions and additions, follows:*

Defendants, Leonard W. Johnson (Johnson), Max French (French), and Arthur G. McKee & Company (McKee), appeal from a judgment entered on a jury verdict in favor of plaintiff, Anand P. Agarwal (Agarwal), in his action for compensatory and punitive damages for defamation and intentional infliction of emotional distress. The major contentions on appeal concern the sufficiency of the evidence of malice and intentional infliction of emotional distress, and the correctness of the jury instructions on an employer's liability for intentional torts of his employees and the proper measure of damages for intentional infliction of emotional distress. For the reasons set forth below, [] [the judgment is affirmed].

Viewing the record most strongly in favor of the judgment, as we must, the following pertinent chronology of facts appears: In May 1969, Agarwal, a native of East India, received his masters degree summa cum laude in systems engineering from West Coast University, which was then rated No. 1 in this field. He was one of three students graduating with distinction in a class of 82. He accepted an offer for employment from McKee in its San Francisco office rather than one from Lockheed because of the management status and potential. His title with McKee was that of scheduling engineer and his beginning salary was $1,000 per month.

---

*Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (See *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases cited.) Footnotes in the Court of Appeal opinion have been renumbered sequentially.

McKee is an international corporation with headquarters in Cleveland, primarily engaged in the design and construction of mineral processing plants in the multimillion dollar range. McKee had about 5,000 employees; in 1976, its net income was $5,454,000. At the time here pertinent, Johnson was the manager of project services, which was comprised of 20-25 employees in 3 departments, estimating, cost control and scheduling. French was Johnson's assistant and the supervisor of the cost control department that gathered information on the status of McKee's various projects and assembled engineering costs reports. Regh was McKee's personnel manager and Aufmuth was a senior vice president and division manager in charge of 200-300 employees; Argenbright was Aufmuth's assistant.

During the 16-month period of his employment, Agarwal worked primarily for Johnson on a variety of assignments, including: development and implementation of variable budgets for project services; implementation of computerized personnel information systems; preparation of computerized schedules on several projects; preparation of manpower forecasts; preparation of computerized concrete estimating data and preparation of engineering progress reports. He also designed a sophisticated comprehensive computerized system for costs control and scheduling that had a potential projected annual savings of $70,000 to $80,000. Agarwal performed all these assignments in a competent manner. Agarwal was never told by anyone that any aspect of his work was unsatisfactory or that he had any problems in working or cooperating with other employees. Both Johnson and French admitted that Agarwal's work on specified projects was good and that he had not been criticized until the last two days of his employment.

In January 1970, when Agarwal received a $50 a month merit increase, Johnson indicated that Agarwal had been doing a good job. McKee's policy required annual performance reviews by the immediate supervisor and one other person familiar with the employee's work. Agarwal had a single performance review conducted by Johnson and French in June 1970. He received the lowest possible rating of "marginal" on this review, but was never informed of this fact, given any suggestions for improvement or given any field assignments to train him in certain practical aspects of McKee's work with which he was not familiar.

Beginning in September 1969, Agarwal became aware of certain instances of neglect or unfairness in the manner in which he was treated

by Johnson. For example, at a department meeting in September 1969, Johnson presented an organization chart on which Agarwal was shown at a lower level and responsible to L. Thomas, who did very different work and received a significantly lower salary than Agarwal. Agarwal never worked under Thomas, who had far less education, and had frequently checked and overseen Thomas' work. Agarwal worked well with Thomas. At the time Agarwal came to work for McKee, Johnson told him that he was a superior to Thomas. When Agarwal called this error in the organization chart to Johnson's attention after the September 1969 meeting, Johnson indicated that it was an error and told him not to worry about it. Thomas did more work on specific contracts and was given the opportunity to log 510 hours of overtime in a period when Agarwal was allowed only 2.

Subsequently, in October 1969, Johnson moved Agarwal out of the office that Agarwal had been sharing with Thomas. Johnson stated to Agarwal that he was being moved because Thomas needed more space. Johnson indicated that, in fact, the move was the result of personality problems between Agarwal and Thomas [and the latter's] annoyance at some of Agarwal's personal habits; however, these matters likewise were never mentioned to Agarwal. The smaller office into which Agarwal was moved had a lighting fixture without a shade which made it difficult for Agarwal to work. He mentioned this matter to Johnson, but Johnson did nothing about it. Agarwal subsequently found a broken shade lining and put it on the fixture, but someone kept removing it. Several months later, after R. Geronim was moved into the office with Agarwal, there were no more problems with the light fixture.

Agarwal had been unsuccessful in obtaining an appointment with Johnson for a period of three or four months. Accordingly, in June 1970, Agarwal wrote a memo to Johnson requesting an opportunity to discuss the computerized system for scheduling and cost control that he had been developing. Johnson refused to give him any time, but told him to consult with Scully, the person in charge of McKee's computer department. Scully had a positive response to Agarwal's program. In July 1970, Agarwal orally asked Johnson for permission to attend a computer application seminar sponsored by the University of California on August 28, 1970. Johnson responded that the seminar appeared an interesting and appropriate one for Agarwal to attend and that permission would be granted in response to a written request. Agarwal then wrote a detailed request, but was denied permission to attend, without explanation.

On the afternoon of Wednesday, September 16, 1970, Johnson assigned Agarwal to work directly under French for the purpose of completing the computerization of a cost progress report. Agarwal received a memorandum on the matter from Johnson as well as one from French, which indicated that Agarwal was also to work in cooperation with the computer department and to be available full time for this project. French's memo indicated a previously established goal of getting most of the reports computerized by the end of the year. Agarwal accepted the new assignment in a memo to Johnson, with a copy to French which indicated that in some areas, he understood he would still be directly responsible to Johnson. Agarwal immediately began to work on the computerizing of the cost control report. Although this project required the use of a computer language with which Agarwal was not familiar, he was capable of handling the matter, as he had extensive background in other computer languages.

The following morning, September 17, 1970, Johnson asked Agarwal to check for errors in the time sheets of some employees. After going through the time sheets and making the necessary corrections, Agarwal returned the time sheets to Johnson. Johnson then told Agarwal to give the time sheets to French. Agarwal did so and was asked by French to take the time sheets around to each of the individual employees to obtain approval of the changes. Agarwal indicated that he had no objection to doing so, but suggested that it would be more efficient to send a secretary around to perform this task because he was in the middle of making the report that he had been assigned. French became outraged and said: "You black nigger, member of an inferior race, get out and do it." Agarwal exercised great self control, asked French to watch his words, but French proudly repeated the above statement.[1] Agarwal then delivered the time sheets to all of the individual employees and returned them to French at 10:15 a.m.

Agarwal then finished the cost progress report that he had been assigned and gave it to the department secretary to type so that it could be sent to French. During the lunch hour, he noticed that the secretary, instead of typing his handwritten report, was copying it on the xerox machine. When he inquired as to why she was not typing it, she indicated that French had instructed her to xerox it, and further had instructed her not to tell Agarwal about it. Agarwal then contacted French by telephone and confirmed this information but French told

---

[1]This conversation occurred in French's office and was not overheard by anyone.

him that he did not want to talk to him and hung up the telephone. Later that afternoon, French telephoned Agarwal and asked him to come into his office. As soon as Agarwal did so, French said: "You son-of-a-bitch, I am going to terminate you."[2] French did not explain why or indicate that Agarwal had done anything wrong. Agarwal returned to his office, became ill and went home early. The following day, Friday, September 18, 1970, Agarwal was still ill and telephoned to indicate that he would not be able to come to work that day.

On Saturday, September 19, Agarwal telephoned Johnson at home, and told him French had been very abusive. Johnson indicated that he had heard something about the matter but gave no indication that he knew Agarwal had been terminated. The following Monday, September 21, Agarwal again talked to Johnson and indicated that he was not yet able to return to work. In response to Agarwal's question, Johnson replied that he had not yet had an opportunity to talk to French but promised to let Agarwal know as soon as he had done so. On Tuesday, September 22, Agarwal telephoned Regh and made an appointment for the following day. Sometime on September 22, the United States Immigration Service telephoned Regh to inquire about Agarwal in connection with his citizenship papers. After Regh indicated that Agarwal was no longer employed by McKee, the immigration agent asked why and Regh replied that he had been terminated for refusing to work for and report to French and because he was not fit for the job he was to do.

The following morning (Wednesday, Sept. 23), when Agarwal talked to Regh, the latter did not mention the conversation with the immigration officer.[3] Agarwal told Regh about everything that had occurred on September 16 and 17, including French's racial epithet and threat of termination. Regh then called Johnson and French into his office. After they arrived, Regh indicated that Agarwal felt mistreated, as he had done good work, and wanted an apology from French for the racial epithet. French replied: "I don't want him and Johnson already wanted to get rid of him." Agarwal asked Johnson for a reason but received no response. Finally, Regh said: "Well, listen, if they don't want you, we can't keep you." Agarwal was not given an opportunity to resign. Final-

---

[2]This statement also was not overheard by any other person.

[3]When Agarwal arrived home that afternoon, his wife indicated that immigration had called and wanted him to come down and fill out some documents.

ly, he became very upset, indicated he had been treated unfairly, and said: "God will punish you."[4]

When Agarwal arrived at home, a check from McKee was in the mail. No explanation came with the check. The following day, September 24, Agarwal wrote a letter to Regh asking for an explanation of the check and indicating that he felt depressed because of his mistreatment by Johnson and French, and wanted to use his sick leave to recuperate. At that time, Agarwal did not know that he had been terminated by McKee.

Several days later, Agarwal received a letter from Johnson dated September 25, indicating that he had been terminated for lack of cooperation and lack of job knowledge. This was the first time Agarwal had ever been told that he lacked job knowledge and had failed to be cooperative. The letter was accompanied by a payroll authorization slip indicating the above stated reasons for termination. On September 26, Agarwal wrote to Aufmuth outlining his grievances and requested assistance.[5] Aufmuth's reply dated October 13, 1970, indicated that he had made an investigation and ascertained that Agarwal had been properly terminated on September 17 for insubordination. This letter was the first explanation Agarwal had of the reason for his termination. Aufmuth did not investigate all of Agarwal's charges but assigned those he considered pertinent to his subordinate, Argenbright. Agarwal's subsequent attempts to resolve the matter were fruitless. Thomas was sent overseas in the fall of 1970 and did not testify at the trial. His "memo for the record" dated October 2, 1970, indicated Thomas' difficulties in working with Agarwal and the latter's refusal to follow established procedures from May 1969 to January 1970.

Agarwal unsuccessfully sought employment for a period of 13 months. He sent out about 250 resumes and had about 30 interviews. Two potential employers indicated that McKee had given him a bad recommendation. In October 1971, Agarwal was hired by the City of San Mateo at $3 an hour; after five months, he received a substantial raise but still earned less than he had earned at McKee. Several

---

[4]The major conflicts in the evidence concern: 1) French's racial epithet, whether it ever occurred and was mentioned by Agarwal to Regh; 2) whether Agarwal knew or had been informed that he was being terminated on September 17 for insubordination.

[5]The letter specifically mentioned the incidents of September 16 and 17, 1970, and also referred to the September 1969 organization chart, the moving of Agarwal's office, and Agarwal's lack of opportunity for overtime.

of his coworkers and supervisors testified as to his competence and cooperation.

Agarwal suffered extreme emotional distress at the time of his termination by McKee in September 1970. At the time, he was in the process of bringing his three children over from India. After they arrived, he could not afford to send his son to the University of California when he had been accepted. As a result of his inability to find other employment for such a long period of time, the family was forced to live in a small apartment and his wife had to go to work and do manual labor.

On September 16, 1971, Agarwal filed the instant complaint against Johnson, French, Regh, Aufmuth and McKee, alleging defamation, infliction of emotional distress, and interference with business relationships. The jury returned a verdict in favor of Agarwal against Johnson, French and McKee for general damages of $16,400; the jury also awarded punitive damages of $1,000 as to Johnson and French, and $45,000 as to McKee.

Johnson, French and McKee first contend that as to the cause of action for defamation, the evidence was insufficient to indicate that the statements concerning Agarwal's "lack of job knowledge and cooperation" were malicious. The trial court limited the defamation cause of action to this statement and also properly instructed the jury on qualified privilege, as this statement was published only within the McKee organization and to the immigration officer.

The applicable statute, Civil Code section 47, subdivision 3, provides, so far as pertinent: "A privileged publication or broadcast is one made—. . .

"3. In a communication, without malice, to a person interested therein (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

■ The malice referred to by the statute is actual malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person. (See *Davis* v. *Hearst,* 160 Cal. 143 [116 P. 530].) The factual issue is whether the

publication was so motivated. "Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given" (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 797 [197 P.2d 713]; *Dietrich* v. *Litton Industries, Inc.,* 12 Cal.App.3d 704, 714 [90 Cal.Rptr. 856]).

■ There is, of course, conflicting evidence in the record. The jury's verdict can be sustained if the record contains any substantial evidence upon which the jury could make a finding that the communication was malicious. Here, Agarwal's evidence indicated that there had been no dissatisfaction with, or criticisms of, his job knowledge and cooperation until the last two days of his employment with McKee. French admitted that he had never before terminated an employee who had been in his department for such a short time and so shortly after a new assignment. The termination was ratified by Johnson, Regh and Aufmuth. French's deposition contradicted his testimony that Agarwal refused to work for him. Johnson, French and others indicated that while there had been problems with both the quality of Agarwal's work and his personality and ability to work with others from the start, no criticisms or negative comments on his job performance had ever been communicated to him. Agarwal had also not been informed of the "marginal" rating that he had received in the June 1970 evaluation report. Thomas' memo bore a date after Agarwal's termination. French, Johnson, Regh and Aufmuth all indicated that, in fact, Agarwal was terminated for insubordination, but that ground was not stated in order to protect his severance benefits. These facts, coupled with Agarwal's testimony concerning French's racial epithet which he reported to Regh, and his consistent denials of the charges of poor performance and insubordination, could lead the jury to believe that the statements of lack of job knowledge and lack of cooperation were maliciously motivated for the purpose of terminating Agarwal.

Thus, assuming the jury believed Agarwal's evidence, we conclude that there was substantial evidence of actual malice that eliminated the privilege (*Toney* v. *State of California,* 54 Cal.App.3d 779, 793 [126 Cal.Rptr. 869]).

Johnson, French and McKee next contend that the evidence was insufficient to support the verdict on intentional infliction of emotional distress, and punitive damages against McKee. This contention is primarily based on their view of the evidence, namely, that French never

made or repeated the racial epithet, and that since Johnson had no knowledge of it, and Regh was exonerated by the jury, there was no ratification by McKee.

■ The applicable law was recently summarized [] in *Newby* v. *Alto Riviera Apartments,* 60 Cal.App.3d 288, at pages 296 and 297 [131 Cal.Rptr. 547], so far as pertinent: A prima facie case requires: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress. [Citations.] The right to recover damages for the intentional infliction of mental distress which results in physical injury has long been recognized in California. [Citations.] The right to recover for emotional distress alone in situations involving extreme and outrageous conduct has also been acknowledged. [Citations.] In 1948, the Restatement of Torts was amended to reflect this trend. The language emphasizes the need to 'look for more in the way of outrage as a guarantee that the claim is genuine' when bodily harm does not accompany the emotional distress. Later decisions, however, have allowed pleading and proof of less outrageous conduct. (*Golden* v. *Dungan, supra* [20 Cal.App.3d 295 (97 Cal.Rptr. 577)] (allegations that process server was banging on door in middle of night stated cause of action for mental distress).)

"The modern rule is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress. (See Prosser, Law of Torts (4th ed. 1971) p. 54.) Ordinarily mere insulting language, without more, does not constitute outrageous conduct. The Restatement view is that liability 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. . . . There is no occasion for the law to intervene . . . where some one's feelings are hurt.' (Rest.2d Torts, § 46, com. d.) Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. (Prosser, Law of Torts, *supra,* at pp. 57-58; Rest.2d Torts, § 46, coms. e, f; *Fletcher* v. *Western National Life Ins. Co., supra,* at p. 397 (insurance agent's threatened and actual refusals to pay; threatening communication in bad faith to settle nonexistent dispute); *Alcorn* v. *Anbro Engineering, Inc., supra,* at p. 496

(supervisor shouting insulting epithets; terminating employment; humiliating plaintiff); *Golden* v. *Dungan, supra,* at p. 305 (process server knowingly and maliciously banging on door at midnight).)"

■ Agarwal here presented substantial evidence that French's use of the racial epithet was outrageous and that French acted knowingly and unreasonably with the intention to inflict mental distress and abused his position to humiliate Agarwal and also to recommend Agarwal's termination for reasons that were not true. The uncontroverted evidence indicated that until the last two days of his employment, Agarwal had not received any criticisms of his work or working relationship with others at McKee. Here, Regh, as personnel manager, did not insist on an apology from French; Johnson refused to provide a reason for the termination to Agarwal. Aufmuth subsequently ratified the termination for the stated reasons that he knew were not true. Even assuming no ratification or authorization by McKee, the rule in this state is that the employer is liable for the wilful misconduct of his employees acting in a managerial capacity (*Kuchta* v. *Allied Builders Corp.,* 21 Cal.App.3d 541, 549-550 [98 Cal.Rptr. 588]). The reason for the imposition of liability is to encourage careful selection and control of persons placed in important management positions (*Kuchta, supra,* at p. 549). French and Johnson were agents of McKee and apparently had the authority to terminate Agarwal. We conclude that the evidence was sufficient to support the verdict on intentional infliction of emotional distress and the punitive damages as to French, Johnson and McKee.

■ We turn next to Johnson, French and McKee's complaints concerning the instructions to the jury on an employer's liability for the intentional torts of employees and the proper measure of damages for intentional infliction of emotional distress.

The record indicates that after the jury was given the instructions, quoted below,[6] the jury was instructed that: "An employer is liable for the willful and malicious torts of his employee committed in the scope

---

[6]"Now Arthur G. McKee & Company is a corporation, and as such can act only through its officers and employees. Any act or omission of an officer or an employee within the scope of his employment is in law the act or omission of such corporation.

"It is established that Leonard W. Johnson, John L. Regh, Max French, R.D. Aufmuth and L. P. Argenbright were the agents of Defendant, Arthur McKee & Company. Therefore, any act or omission of such agents was in law the act or omission of Defendant, Arthur McKee & Company.

"It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's authority or employment. Such

of the employment." Subsequently, the jury was given general instructions on punitive damages. [] [Johnson, French, and McKee assert] the above quoted instruction failed to distinguish between the employer's compensatory and punitive damage liability for the wilful and malicious torts of employees [] [and thus constitutes reversible error. At the time of trial they did not request an alternative instruction making such a distinction.

At the outset, we note that on this issue *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451 [136 Cal.Rptr. 653], is directly in point. There the defendant complained on appeal that an instruction stating the general rule of respondeat superior "erroneously informed the jury that defendant could be assessed punitive damages on that theory." (*Id.* at p. 468.) The court disagreed on the ground that the instruction did not address the issue of punitive damages nor was it given in conjunction with the instructions covering that issue. Since the instruction correctly stated the law on the issue for which it was given, the court held that "If defendant desired another instruction directed to its answerability for punitive damages it was incumbent upon it to request such an instruction." (*Ibid.*)

Although *Little* is both clear and persuasive, neither party relies upon its applicability. Their respective arguments focus on whether Johnson, French, and McKee have waived their right to raise the objection on appeal and on the merits of whether McKee is liable for punitive damages under the doctrine of respondeat superior.

Agarwal contends Johnson, French, and McKee are precluded from attacking the instruction by their failure to offer an alternative instruction on the subject. ▇ It is settled that a party may not complain on appeal that an instruction correct in law is too general or incomplete unless he had requested an additional or qualifying instruction. (*Ornales v. Wigger* (1950) 35 Cal.2d 474, 479 [218 P.2d 531], disapproved on another point in *Alarid v. Vanier* (1958) 50 Cal.2d 617, 622-624 [327 P.2d 897]; *Townsend v. Butterfield* (1914) 168 Cal. 564, 569 [143 P. 760]; *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5,

---

conduct is within the scope of his authority or employment if it occurs while the agent is engaged in duties which he was employed to perform and related to those duties.

"Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority or employment."

13 [130 Cal.Rptr. 416]; *Downing v. Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 523 [113 Cal.Rptr. 277].)

However, it is equally settled, as Johnson, French, and McKee maintain, that they are deemed to have excepted to every instruction given and are therefore not barred by their failure to offer an alternative instruction from asserting error in the instruction as given. (Code Civ. Proc., § 647; *Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 583-584 & fn. 4 [153 Cal.Rptr. 213, 591 P.2d 503]; *Barrera v. De La Torre* (1957) 48 Cal.2d 166, 170 [308 P.2d 724].) The distinction between these propositions was discussed in *Rivera v. Parma* (1960) 54 Cal.2d 313, 316 [5 Cal.Rptr. 665, 353 P.2d 273]: "'To hold that it is the duty of a party to correct the errors of his adversary's instructions . . .would be in contravention of section 647, Code of Civil Procedure, which gives a party an exception to instructions that are given . . . . While the exception will be of no avail where an instruction states the law correctly but is "deficient merely by reason of generality," in other cases he will not be foreclosed from claiming error and prejudice.'"

██ Our task is thus to determine whether the instruction as given contained an incorrect statement of law; only then may Johnson, French, and McKee now be heard to complain of error. Although they vigorously urge the instruction should have been qualified, if it was otherwise correct they have waived their right to such objection by their failure to have offered to the trial judge any qualifying language.

In *Carr v. Wm. C. Crowell Co.* (1946) 28 Cal.2d 652, 654 [171 P.2d 5], we stated: "It is settled that an employer is liable for wilful and malicious torts of his employee committed in the scope of the employment." Since the instruction here in issue tracked this language verbatim, our inquiry would appear to be ended. As an instruction on liability, it correctly stated the rule of vicarious liability based on the doctrine of respondeat superior. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 155, pp. 754-755, § 173, pp. 770-771.)

Johnson, French, and McKee assert the instruction was "both erroneous and prejudicial," "only partially correct," and "wholly inadequate." Nowhere, however, do they refute Agarwal's contention that the instruction was itself a correct statement of the law governing liability. Instead they complain the jury was misled because the instruction

"completely failed to recite or even mention the additional elements necessary to make an employer liable for *punitive damages* by reason of the acts of his employees." (Italics added.) With regard to the issue of damages, it is true that an employer whose liability has been established by respondeat superior may be liable for compensatory but not punitive damages, depending on the circumstances of the case.]

■ The applicable law was set forth in *Merlo* v. *Standard Life & Acc. Ins. Co.,* 59 Cal.App.3d 5, at page 18 [130 Cal.Rptr. 416], as follows: "'While an employer may be liable for an employee's tort under the doctrine of *respondeat superior,* he is not responsible for punitive damages where he neither directed nor ratified the act. [Citations omitted.] [¶] California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a principal because of an act by an agent if, but only if "(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act."'[] (*Hale* v. *Farmers Ins. Exch.,* 42 Cal. App.3d 681, 690-691 [117 Cal.Rptr. 146].)" [See also *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822 (157 Cal.Rptr. 482, 598 P.2d 452).]

[] [It does not follow, however, that an instruction on vicarious liability must subsume the applicable law on damages. ■ A court is not required to embody all the law that may be gleaned from the instructions read together as a whole in any one instruction (*Westover* v. *City of Los Angeles* (1942) 20 Cal.2d 635, 637 [128 P.2d 350]; *Hall* v. *Steele* (1924) 193 Cal. 602, 609 [226 P. 854]), nor was Agarwal, as the party requesting the challenged instruction, required to do so (*Scarborough* v. *Urgo* (1923) 191 Cal. 341, 347-348 [216 P. 584]; *Stein* v. *United Railroads* (1911) 159 Cal. 368, 372 [113 P. 663]).[7] Rather, "In

---

[7]The assertion that the decision in *Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891 [99 Cal.Rptr. 706], requires reversal of this case is thus without merit. In *Ebaugh* an instruction containing language similar to that here in question was held to be prejudicially erroneous. The court, however, gave the instruction after "specifically directing the attention of the jury to the subject of punitive damages." (*Id.* at p. 896.) The error identified by the Court of Appeal was that the instruction was "germane only to the issue of *respondeat superior* [and had] no application to the question of an employer's liability for punitive damages." *(Ibid.)* In the present case there is no indication the instruction was offered on the issue of damages. Indeed, the record indicates both plaintiff and defendants requested extensive instructions on the subject of damages.]

a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion." (*Downing* v. *Barrett Mobile Home Transport, Inc., supra,* 38 Cal.App.3d at p. 523; accord, *Willden* v. *Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 636 [135 Cal.Rptr. 69, 557 P.2d 501]; *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 13.)

In light of the foregoing we conclude that Johnson, French, and McKee have waived their right to complain that a qualified instruction distinguishing between McKee's vicarious liability for compensatory and for punitive damages should have been given. Neither have they provided authority that would impose on the court a duty to instruct on its own motion. As noted above, there ordinarily is no duty to instruct in the absence of a specific request by a party; the exception is a complete failure to instruct on material issues and controlling legal principles which may amount to reversible error. (See, e.g., *Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 482-483 [71 P.2d 220]; *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 157-158 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Thomas* v. *Buttress & McClellan, Inc.* (1956) 141 Cal. App.2d 812, 819-820 [297 P.2d 768].)

Although there is some indication of the existence of a duty to instruct *sua sponte* on the proper measure of damages (see *Pepper* v. *Underwood* (1975) 48 Cal.App.3d 698, 708-709 [122 Cal.Rptr. 343]; *Thomas* v. *Buttress & McClellan, Inc., supra,* 141 Cal.App.2d at pp. 819-820), we need not reach the issue. As we stated in *People* v. *Bradford* (1976) 17 Cal.3d 8, 18 [130 Cal.Rptr. 129, 549 P.2d 1225], in which the defendant contended the trial court erred in failing to give an instruction *sua sponte,* "The short answer to this contention is that, assuming *arguendo* that failure to give such instruction was error, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error .... (See Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)"[8] Similarly, in this case, there is no reason to believe a different verdict would have been reached had the jury been instructed on the Restatement rule quoted above, because it is uncontroverted that John-

---

[8]That *Bradford* is a criminal case does not foreclose its applicability. It has been observed that the duty to instruct *sua sponte* in civil cases is less demanding than that imposed in criminal cases. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 195, p. 3015; Robinson, A *Proposal for Limiting the Duty of the Trial Judge to Instruct the Jury Sua Sponte* (1974) 11 San Diego L. Rev. 325, 348.)]

son and French were "employed in a managerial capacity" and "acting in the scope of employment." Although it is blandly asserted that Johnson and French were lower in McKee's hierarchy than other corporate officials who participated in Agarwal's discharge, the fact remains that they were directly responsible for supervising Agarwal's performance and had the most immediate control over the decision to terminate him. In *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pages 822-823, we rejected a narrow construction of the Restatement rule in determining whether employees were employed in a managerial capacity. So here, the authority vested in Johnson and McKee regarding the decision to discharge Agarwal was sufficient to support the imposition of punitive damages against McKee.

Johnson, French, and McKee next assert the court committed error in its] refusal of a proffered instruction [allegedly] based on *Fletcher* v. *Western National Life* [*Ins. Co.*], 10 Cal.App.3d 376, 402, 405-406 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], set forth below.[9] The record indicates that the court instructed the jury as follows: "A Plaintiff who has been subjected to outrageous conduct by a Defendant, as general damages, is entitled to compensation for the emotional distress, humiliation, and embarrassment caused by such conduct.

"In addition to general damages, a Plaintiff is also entitled to compensation for any special damages suffered by him resulting from the Defendants' outrageous or defamatory acts.

"Such special damages in this action includes the Plaintiff's loss of income from employment and all damage suffered by him in respect to his profession proximately caused by the acts of the Defendant."

■ [There is no substance whatever in the contention that the court "erroneously directed the jury to award damages for economic loss resulting from the intentional infliction, in violation of *Fletcher*...." Our reading of *Fletcher* leads us to conclude the instruction given was not error and, moreover, was explicitly permissible. Although the court in that decision noted the tort of intentional infliction of emotional distress is not chiefly aimed at redressing economic losses, it clearly stated com-

---

[9]"If proved by a preponderance of the evidence and you find that defendants or any of them have inflicted intentional emotional distress on plaintiff, plaintiff is entitled to recover damage only for the emotional distress and not economic loss resulting therefrom unless such loss actually results from the intentionally caused emotional distress."

pensation for economic loss that results from the intentionally caused emotional distress is proper. (*Id.* at p. 402.) This interpretation finds support in the BAJI instruction based on *Fletcher,* which provides that damages for the intentional infliction of emotional distress may include "Reasonable compensation for any financial loss suffered by the plaintiff which was proximately caused by emotional distress." (BAJI No. 12.88 (6th ed. 1977).)

Although inartfully articulated, the essence of the challenge to the instruction appears to be that it was erroneous because it misled the jury into awarding general damages for "economic loss not causally related to emotional distress." The contention, however, disregards the plain language of the instruction that any special damages, including loss of income from employment, must have "result[ed] from the Defendants' outrageous or defamatory acts." ▉ The jury awarded Agarwal general damages in the amount of $16,400. We do not deem the award excessive as compensation for harm suffered from the intentional infliction of emotional distress, which may include humiliation, anxiety, and mental anguish. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173]; BAJI No. 12.72 (6th ed. 1977).) Such harm, though less susceptible of precise measurement than more tangible pecuniary losses or physical injuries would be, is no less real or worthy of compensation. And it is the members of the jury who, when properly instructed, are in the best position to assess the degree of the harm suffered and to fix a monetary amount as just compensation therefor. (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880]; *Beagle* v. *Vasold* (1966) 65 Cal.2d 166, 172 [53 Cal.Rptr. 129, 417 P.2d 673]; *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282].) We thus reject as unpersuasive the observation of Johnson, French, and McKee that the amount of the general damages verdict was roughly equal to 15 months of Agarwal's salary. Not only is the inference they seek to draw inconsistent with the fact that Agarwal was unemployed for 13 rather than 15 months but, more importantly, it invites speculation as to the basis of the verdict. ▉ It cannot be presumed on appeal that the jury ignored a proper instruction on damages. (*Sherwood* v. *Rossini* (1968) 264 Cal.App.2d 926, 929 [71 Cal.Rptr. 1].)[10]]

[10In light of our conclusion that the claim of prejudicially erroneous instructions is without merit, we need not consider Agarwal's contention as to the standard of review we should apply.]

 On March 28, 1978, while the instant appeal was pending, [ ] Johnson, French, and McKee moved for a determination on the basis of res judicata, as the result of a September 1977 federal district court judgment in a title VII case between the parties. They urge the application of the exception to the general rule that where a judgment becomes final while an appeal in another action presenting the same issues is pending, the first final judgment may be brought to the attention of the appellate court and may be relied upon as res judicata (*Ruben* v. *City of Los Angeles,* 51 Cal.2d 857, fn. 1, at p. 861 [337 P.2d 825]). In the interests of judicial economy and efficiency, [ ] [the Court of Appeal] permitted the belated filing of the defense motion and Agarwal's opposition [ ] [and] consolidated the motion with this appeal.

 The certified copy of the federal judgment[11] indicates that it involves Agarwal's individual and class claims against McKee for damages and injunctive relief pursuant to title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). The federal court concluded the plaintiffs had not met the burden of class and individual discrimination, and that French had not used the racial epithet on September 17, 1970. While the federal action was based on the same underlying facts as the instant case, it does not follow that the federal judgment is res judicata.

 [ ] [Under one aspect of the doctrine of res judicata, "A valid final judgment on the merits in favor of a defendant serves as a complete bar to further litigation on the same cause of action." (*Slather* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].) Unless the requisite identity of causes of action is established, however, the first judgment will not operate as a bar. Johnson, French, and McKee contend Agarwal's state and federal claims comprise but one cause of action because they arise from the same set of operative facts. We do not agree. Under the "primary rights" theory adhered to in California it is true there is only a single cause of action for the invasion of one primary right. *(Ibid.)* But the significant factor is the harm suffered; that the same facts are involved in both suits is not conclusive.

---

[11]In part, the motion takes advantage of the federal rule under which a judgment once rendered is final for purposes of res judicata until reversed on appeal, modified or set aside in the court of rendition []. [*Calhoun* v. *Franchise Tax Bd.* (1978) 20 Cal.3d 881, 887 (143 Cal.Rptr. 692, 574 P.2d 763).] Under the California rule, the instant judgment, although entered before the federal one, is not final for purposes of res judicata during the pendency of and until the resolution of the appeal. (*Wood* v. *Herson,* 39 Cal.App.3d 737, 747 [114 Cal.Rptr. 365]; Code Civ. Proc., § 1049.)

(*Langley* v. *Schumacker* (1956) 46 Cal.2d 601, 602-603 [297 P.2d 977].)

Title VII vests employees with independent federal statutory rights against discriminatory employment practices. It does not supplant state remedies. Accordingly, "Since monetary damages under title VII are limited to recovery of back pay, alternate causes of action under state law may be particularly important where the discriminatee might recover damages other than back pay." (Fn. omitted.) (Schlei & Grossman, Employment Discrimination Law (1976) p. 678.) Defamation and intentional infliction of emotional distress are specifically recognized as potentially available causes of action under state law. (*Id.* at p. 680.)

In the present case the federal court action proceeded to trial only on the individual and class claims of discrimination under title VII. Our review of the district court's findings of fact discloses that its attention was primarily directed to McKee's employment practices and the corresponding impact on racial minorities, and to statistical analyses of the McKee employee population. Although Agarwal's state court claims for defamation and intentional infliction of emotional distress arose in conjunction with the alleged violation of title VII, the fact remains that in the present action he was awarded damages for harm distinct from employment discrimination. (Cf. *Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36, 49-50, & fn. 10 [39 L.Ed.2d 147, 158-159, 94 S.Ct. 1011].)]

The motion to dismiss based on res judicata is denied. The judgment is [affirmed].

Bird, C. J., Tobriner, J., Manuel, J., and Newman, J., concurred.

**RICHARDSON, J.**—I concur in the judgment, under the compulsion of *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [157 Cal.Rptr. 482, 598 P.2d 452]. But for the majority's holding in *Egan,* we might well conclude that employees Johnson and French were not employed in a "managerial capacity," and that accordingly employer McKee should not have been assessed punitive damages by reason of their misconduct.

Clark, J., concurred.