LUI, J.,
Concurring and Dissenting.—Although I agree with the majority on some of its analysis, I disagree with the majority’s conclusions concerning both the scope of the creative process and the scope of the release that appellant Pierre Daniel (Daniel) signed. I also believe that Daniel demonstrated a reasonable probability that he would prevail on his cause of action *401 for intentional infliction of emotional distress. Accordingly, I would reverse the trial court’s ruling in part and permit Daniel’s action to proceed on claims relating to both the alleged on-set conduct of respondent Marlon Wayans (Wayans) and to his Internet posting.
Because this is an appeal from an order granting an anti-SLAPP motion, we must accept the “plaintiff’s evidence as true.” (Baral v. Schnitt (2016) 1 Cal.5th 376, 385 [205 Cal.Rptr.3d 475, 376 P.3d 604] (Bared).) We evaluate the defendant’s showing “only to determine if it defeats the plaintiff’s claim as a matter of law.” {Ibid.) Under that standard, we are faced with the following facts.
Daniel was hired for one day as an extra on a movie, A Haunted House 2. While on the set, when no filming was occurring, the producer, cowriter and star of the movie, Wayans, repeatedly called Daniel “ ‘nigga’ ” and a “ ‘black fat ass,’ ” mocked him for his “ ‘Afro’ ” hairstyle, approached Daniel while sneering, leering and rolling his eyes, compared Daniel to an unflattering character (Cleveland Brown) in the animated series Family Guy, and generally treated him in a demeaning and abusive manner. Daniel had no prior relationship with Wayans and did not participate in this insulting conduct that Wayans characterized as “joking.” Indeed, he testified that he walked away.
The insulting conduct was not limited to the set. Without Daniel’s permission, Wayans took Daniel’s picture on Wayans’s cell phone. Wayans posted the picture on his personal Twitter account next to a picture of the Cleveland Brown animated character with a caption comparing “ ‘this nigga’ ” (Daniel) to “ ‘THIS NIGGA’ ” (Cleveland Brown). Many people saw the pictures, resulting in repeated embarrassing questions as to whether Daniel is the “ ‘Cleveland Brown’ ” character from Wayans’s post.
1. Wayans’s on-set conduct, as alleged, was not in furtherance of his constitutional right to free speech
The majority concludes that Wayans’s alleged on-set conduct was protected under the anti-SLAPP statute because it was part of the creative process of making the movie. (Code Civ. Proc., §425.16, subd. (e)(4).)[1] The majority observes that Daniel did not rebut Wayans’s evidence that creation of the movie involved a great deal of on-set improvisation both before and during filming, along with a “ ‘light, funny atmosphere’ ” in which “ ‘[ejveryone . . . joked around with each other as part of the creative process.’ ” (Maj. opn. ante, at p. 385.)
The problem with this analysis is that Daniel did not willingly participate in this creative process. Under Daniel’s version of events—which we must *402 accept on this appeal—he was not a collaborator in a crass but collegial brainstorming session. He did not know Wayans. He was not hired to be a writer or creative consultant. He was an extra hired for one day to be a “non-descriptive furniture mover who would be assisting in moving boxes in and out of a house.” He was the target of, not a participant in, others’ demeaning and offensive humor.
The humor was racially charged. We have no reason to question Wayans’s claim that he commonly uses the term “ ‘nigga’ ” as a term of endearment with friends of all races. But it hardly stretches credibility when Daniel claims that the use of such an historically fraught term offended and insulted him.[2] Most important, it is not our role to decide credibility. We accept Daniel’s testimony that he was offended and evaluate the circumstances in which the offensive conduct occurred.
Daniel’s claim that the conduct at issue here was specifically directed at him creates a critical difference between the facts of this case and the facts in Lyle v. Warner Brothers Television Productions (2006) 38 Cal.4th 264 [42 Cal.Rptr.3d 2, 132 P.3d 211] (Lyle), which the majority suggests provides “insights about the creative process for developing a somewhat raunchy comedy.” (Maj. opn. ante, at p. 384, fn. 2.) In Lyle, a former comedy assistant on the television show Friends brought a claim for sexual harassment based upon sexually explicit language that the male writers used. In affirming summary judgment, our Supreme Court was careful to note that the record showed that the sexual antics and discussions at issue “did not involve and were not aimed at plaintiff or any other female employee.” (Lyle, at p. 287.) Here, the conduct at issue was allegedly aimed at Daniel.
In his concurring opinion in Lyle, Justice Chin explained that protection of the creative process is particularly important in lawsuits that are “directed at restricting the creative process in a workplace whose very business is speech related.” (Lyle, supra, 38 Cal.4th at p. 297 (cone. opn. of Chin, J.).) But he also concluded that, “[j]ust as criminal threats are not protected, just as no *403 one has the right to falsely shout ‘fire’ in a crowded theater, limits exist as to what may occur in the writers’ room.” (Id. at p. 299.) Even in that context, ‘“speech that is directed, or ‘aimed at a particular employee because of her race, sex, religion, or national origin,’ is not protected.” (Ibid., quoting Volokh, Freedom of Speech and Workplace Harassment (1992) 39 UCLA L.Rev. 1791, 1846.) I would draw that same line here.
The record in this case supports such a limit. Wayans did not claim that offensive conduct targeting a particular person is part of his creative process. Rather, he testified that Daniel was ‘“laughing and joking” along with the rest of the cast and claimed that Daniel never objected or suggested that ‘“he was uncomfortable in any way with the joke.”[3] His costar, Jaime Pressly, went even further in explaining the nature of the creative process that Wayans employed on the set. She testified that ‘“[t]he practice on set is that if anyone is uncomfortable with anything that is said, we take it back and agree not to use it. As part of his practice, Mr. Wayans makes sure that the subject of the joke is okay with the joke.” Thus, Wayans himself apparently does not believe that the creative process must extend to conduct that directly offends a cast member.
There are no discernible limits to the conduct that would be protected under the majority’s interpretation of the creative process. What if, for example, a producer/writer/actor claimed that he needed to inspire his creative muse by repeatedly using racial epithets toward and mocking the appearance of a caterer who happened to be near the set? Or what if he engaged in unwanted sexual conduct with a female extra during a lunch break as a way to try out a new joke? Or parodied a disabled production assistant? Under the majority’s analysis, it seems that a writer or actor has free rein to insult and degrade others so long as he or she claims that it somehow helps him or her to make movies.
True, victims of such conduct might get past an anti-SLAPP motion if they manage to convince a court that they will probably succeed on their claims. But requiring them to make such a showing before they have even had an opportunity for discovery is an unwarranted extension of the prelitigation screening authorized by the anti-SLAPP statute and stretches the definition of conduct that is ‘“in furtherance of’ the constitutional right of free speech beyond any reasonable bound. (§ 425.16, subd. (e)(4).)
I recognize, of course, that the anti-SLAPP statute is to be broadly construed and that to prevail on an anti-SLAPP motion a defendant need not *404 prove that the plaintiffs motive in bringing the lawsuit was actually to chill the exercise of the defendant’s constitutional rights or that the action has actually had a chilling effect on the exercise of such rights. (§425.16, subd. (a); Navellier v. Sletten (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) The scope of the anti-SLAPP statute therefore can extend beyond the “quintessential” SLAPP, which is “filed by an economic powerhouse to dissuade its opponent from exercising its constitutional right to free speech or to petition.” (Nam v. Regents of University of California (2016) 1 Cal.App.5th 1176, 1193 [205 Cal.Rptr.3d 687] (Nam).)
However, in considering how far to extend the definition of the creative process for purposes of anti-SLAPP protection, it is appropriate to consider the stated legislative purpose of the anti-SLAPP statute, which is to address “lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.” (§425.16, subd. (a); see Nam, supra, 1 Cal.App.5th at pp. 1189, 1193.) The record of this case does not suggest that permitting a lawsuit by an extra for racially offensive conduct directed toward him on the set would have any effect on the content of movies or the creative process for making them. While improvisation and racially tinged bantering might be a part of Wayans’s creative process, there is no reason to believe that this process must include conduct amounting to racial harassment of a subordinate employee. To the contrary: As discussed above, Wayans’s evidence showed that his typical creative process was intended to be collaborative and to make sure that no one is made to feel uncomfortable.
On the other hand, extending the definition of the creative process to encompass such conduct does threaten to chill meritorious lawsuits with the prospect of losing an anti-SLAPP motion. Individuals such as Daniel—who is hardly an “economic powerhouse” in the hierarchy of Hollywood—are far more likely to be intimidated by the possibility of a substantial attorney fee award than they are to file suit for the purpose of intimidation. (See Nam, supra, 1 Cal.App.5th at pp. 1188-1189 [anti-SLAPP law “was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of their right to petition for fear of an onerous attorney fee award”].)
In concluding that the conduct at issue here—alleged racially offensive and degrading comments specifically aimed at Daniel—should not be considered in furtherance of constitutionally protected free speech, I do not suggest that the trial court should have evaluated the merits of Daniel’s racial harassment claim as part of the first step in the SLAPP analysis. The relevant distinction *405 here is not between conduct that would or would not support a harassment claim. Rather, the important distinction for purposes of defining the contours of the creative process is between creative collaboration, even if it includes offensive topics, and demeaning conduct that is directed at a specific person. The latter is outside the bounds of constitutionally protected free speech. (Lyle, supra, 38 Cal.4th at pp. 299-300 (cone. opn. of Chin, J.).)
Therefore, I would hold that, with respect to Wayans’s alleged on-set conduct, Wayans failed to prove the first step of his anti-SLAPP motion. The alleged conduct was not in furtherance of his constitutional right of free speech, and the trial court should have permitted Daniel’s claim for racial harassment to proceed with respect to such conduct. For the same reason, the trial court should have permitted Daniel’s 10th cause of action for intentional infliction of emotional distress to proceed with respect to Wayans’s alleged on-set conduct.
2. Wayans failed to provide evidence sufficient to show that the scope of Daniel's release extended to Wayans’s Internet posting
I agree with the majority that the “allegedly harassing and offensive Internet posting was a writing made in a place open to the public or a public forum and it was made in connection with an issue of public interest.” (Maj. opn. ante, at p. 387; see §425.16, subd. (e)(3).) The trial court therefore properly concluded that Wayans met his burden with respect to the first step of the SLAPP analysis with respect to the Internet posting.
However, I disagree with the majority’s analysis of the second step of the anti-SLAPP inquiry concerning the merits of Daniel’s claims. The majority accepts Wayans’s argument that Daniel executed a broad union voucher that precludes his claims for statutory and common law misappropriation of likeness (Daniel’s fifth and sixth causes of action) and for implied contract and unjust enrichment (Daniel’s eighth and ninth causes of action). In my view, Wayans did not meet his burden to show that the scope of the consent that Daniel provided in the voucher extended to Wayans’s Internet posting.
Wayans’s only evidence concerning the scope of the union voucher was the voucher itself and two sentences in a declaration submitted by a producer and cowriter of A Haunted House 2, Rick Alvarez. The Alvarez declaration purports to identify the voucher as a “Standard Union Voucher” that Daniel signed, and states that “Dumb Ass Productions” was a production company for A Haunted House 2, “which is why that company is listed on the Standard Union Voucher.”
The voucher, which bears the signature “Pierre Daniel,” grants to the “Production Company of The Production, its successors, assignees, licensees *406 or any other person or company who might gain title or rights to the production, the right to photograph me and record my voice to use, alter, dub, edit and or otherwise change such photographs and recordings, in any manner whatsoever and for any reason in connection with The Production, such right to be worldwide and in perpetuity.” The only identification of ‘“The Production” appears in a field for “PRODUCTION & PROJECT NAME,” which lists “Dumb Ass Prod.” The voucher does not mention Wayans or A Haunted House 2.
I do not believe that this evidence is sufficient as a matter of law to overcome Daniel’s testimony that Wayans did not have his consent to take his picture and to post it on the Internet. (Baral, supra, 1 Cal.5th at p. 385 [defendant’s showing must “defeat[] the plaintiff’s claim as a matter of law”].) The record does not establish that the consent in the voucher (1) applied to Wayans or (2) applied to the use that Wayans made of it.
The majority concludes that Wayans was entitled to the benefit of the release because there was evidence that Dumb Ass Productions was a production company for A Haunted House 2 and Wayans was a coproducer of the movie. (Maj. opn. ante, at p. 395.) But there was no evidence of any connection between Wayans and Dumb Ass Productions, which is the only entity identified on the voucher. Thus, there is insufficient evidence to show that Wayans either was acting on behalf of Dumb Ass Productions in making the Internet post or was one of the “successors, assignees, licensees” of Dumb Ass Productions or a person with rights to the production.
There was also insufficient evidence to establish that Wayans was acting “in connection with The Production” in making that post. Wayans made the post to his own Twitter account. The only connection to A Haunted House 2 was a link to the movie’s Twitter and Instagram pages, which Wayans included along with a link to his own website. Wayans’s declaration does not address why he made the post. According to Daniel, Wayans took Daniel’s picture on Wayans’s cell phone without Daniel’s knowledge or permission during a break. There is a difference between photography done for the purpose of filming and photography allegedly done during a break on a personal device for the purpose of posting on a personal Twitter account. Without more evidence to show that Wayans’s particular use of Daniel’s picture was “in connection with The Production” as contemplated by the standard release in the union voucher, I would not preclude Daniel’s claim as a matter of law.
I am also not persuaded that Wayans’s Internet post was a “transformative use” of Daniel’s likeness as a matter of law. The Internet post in issue in this case contained no significant transformative elements. Wayans used Daniel’s *407 photo not as raw material for an original work, but as a literal depiction of Daniel’s appearance and a literal depiction of the appearance of cartoon character Cleveland Brown. Wayans simply repackaged the two images together and added a caption remarking upon the resemblance of the two. This was not a transformation that was primarily Wayans’s own expression. Thus, the facts here are closer to the use of the literal likeness of The Three Stooges in Comedy III Production, Inc. v. Gary Saderup, Inc. (2001) 25 Cal.4th 387, 408 [106 Cal.Rptr.2d 126, 21 P.3d 797], than to the comic book illustrations of “fanciful, creative characters” in Winter v. DC Comics (2003) 30 Cal.4th 881, 892 [134 Cal.Rptr.2d 634, 69 R3d 473].
3. Daniel demonstrated a reasonable probability that he would succeed on his claim for intentional infliction of emotioned distress
Because I conclude that Wayans’s Internet posting was protected free speech under the anti-SLAPP statute, it is necessary to consider whether Daniel showed that he had a reasonable probability of prevailing on his claim that the Internet post referring to him as “nigga” and comparing his picture to the picture of Cleveland Brown amounted to intentional infliction of emotional distress.[4] I conclude that he did.
The majority finds that Wayans’s alleged conduct, including the Internet post, “was not so extreme as to exceed all bounds of that usually tolerated in a civilized community,” but was “more in the category of insults, indignities, annoyances, and petty oppressions.” (Maj. opn. ante, at p. 400.) For the reasons discussed earlier, I disagree that Wayans’s use of the term “nigga” in his post to refer to Daniel was not extreme as a matter of law. Again, context is important. Daniel saw the post after a day in which he claims Wayans subjected him to in-person racial harassment and demeaning treatment. If, as he claims, he was the target of racial insults by Wayans previously, it was reasonable to expect that he would react to the term “nigga” in the Internet post as more of the same. It was also highly foreseeable that Wayans’s comparison of Daniel to an unflattering African-American animated character on Wayans’s personal Twitter account—which he testified had over a million followers—could cause extreme distress. Daniel testified that it did, claiming that he lost sleep and was apprehensive about going out in public. Wayans’s post has been reposted and could easily be viewable for years.
California courts have repeatedly held that the use of racial epithets can support a cause of action for intentional infliction of emotional distress. *408 (Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216] [African-American plaintiff stated a cause of action for intentional infliction of emotional distress based upon allegations that his supervisor referred to him using the term “niggers” in a demeaning manner]; Agarwal v. Johnson (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58] [affirming jury verdict on the plaintiffs claim for intentional infliction of emotional distress based on conduct that included the use of racial epithets by the plaintiffs supervisor to humiliate him], disapproved on another point in White v. Ultramar, Inc. (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944]; Robinson v. Hewlett-Packard Corp. (1986) 183 Cal.App.3d 1108 [228 Cal.Rptr. 591] [supervisor insulted plaintiff and his race in an employment setting].) A jury could reasonably find that Wayans’s alleged conduct was outrageous, and I would therefore permit Daniel’s intentional infliction claim to proceed.[5]
4. Conclusion
Accordingly, I would reverse the judgment and the order granting the anti-SLAPP motion and dismissing the complaint and direct the trial court to enter a new order partially granting the anti-SLAPP motion and striking the false light and Unruh Civil Rights Act (Civ. Code, § 51 et seq.) causes of action in their entirety and paragraph 9(h) of the racial harassment claim.
Appellant’s petition for review by the Supreme Court was granted May 10, 2017, S240704.

 Subsequent undesignated statutory references are to the Code of Civil Procedure.

 The majority engages in a scholarly discussion of the evolution of, and differences between, the terms “nigger” and “nigga” and the current offensive and inoffensive usages of the terms. But the key component of that analysis is that the meaning of the terms depends upon the circumstances. As the majority explains, the term “ ‘nigga’ ” “can have a number of different meanings when used by different people in different contexts.” (Maj. opn. ante, at p. 391, fn. 7.) No one can seriously question that either term can be highly offensive when used in an offensive manner. Indeed, in recognition of the term’s connotations, in 2007 the NAACP held a mock funeral for the “N” word, complete with a horse drawn carriage carrying “a wooden coffin that adorned black roses and a ribbon with the word ‘nigga’ displayed.” (<http://www.naacp.org/latest/the-n-word-is-laid-to-rest-by-the-naacp> [as of Feb. 9, 2017].) The context that Daniel describes in this case is use of the term “ ‘nigga’ ” by one person (Wayans) to refer to another person (Daniel) who found the term “racially offensive and derogatory.”

 Parents might recognize a common defense to jokes that bring their child to tears: “We’re not laughing at you, we’re laughing with you.” The child’s typical response, “But I’m not laughing,” is equally appropriate here. According to Daniel, he was not laughing.

 As mentioned, I believe that Wayans’s alleged on-set conduct was not protected free speech activity, and it is therefore unnecessary to reach the question whether Daniel’s evidence was sufficient to support a claim for intentional infliction of emotional distress on that aspect of his claim.

 On the other hand, I do not believe that Daniel demonstrated a reasonable probability of succeeding on the portion of his racial harassment claim concerning the Internet post. Because Daniel did not even know about Wayans’s Internet post until he got home and checked the Internet after his single day of employment on A Haunted House 2 had ended, the Internet post could not have created a hostile environment so severe as to interfere with his (already completed) work performance. (Thompson v. City of Monrovia (2010) 186 Cal.App.4th 860, 876 [112 Cal.Rptr.3d 377].) Therefore, paragraph 9(h) of the complaint, which alleges the Internet posting, should have been stricken from Daniel’s racial harassment claim.